NIAGARA FALLS INTERNATIONAL BRIDGE COMPANY and Another, Appellants, *v.* THE GRAND TRUNK RAILWAY COMPANY OF CANADA and Another, Respondents.

Fourth Department, March 11, 1925.

Contracts — construction — action to restrain defendants from switching cars and trains on upper floor of plaintiffs' bridge over Niagara river — original contract made in 1853 provided that no locomotives or cars should stop or remain on bridge — said provision not changed by subsequent supplemental agreements — occasional use of bridge for switching purposes, not under claim of right, was not practical construction of contract and did not estop plaintiffs — defendants will be restrained from using bridge for switching purposes — jurisdiction — injunction may be enforced against defendant foreign corporation doing business in this State.

The plaintiffs who, together, owned the International Bridge spanning the Niagara river, are entitled to an injunction restraining the defendants from using the upper floor of the bridge for the purpose of switching railroad cars and trains, since it appears that the original agreement between the plaintiffs and one of the defendants, which was made in 1853, provided that no locomotives or cars should be stopped or allowed to remain on the bridge when passing over; that several supplemental agreements entered into thereafter did not change the original agreement in reference to that provision; that while from time to time a portion of the bridge was used for switching cars and trains, there was no general use thereof under a claim of right, and the evidence tends to show that, at least until 1918, the defendant which made the agreement considered that it did not have the right to use the bridge for switching trains and cars; that the plaintiffs insisted, at least from 1896 down to the commencement of this action, that the right did not exist, and protested against the use of the bridge for switching purposes on the ground that the overstrain caused thereby injured the bridge; and that the said defendant was not misled by the plaintiffs into the belief that it had the right to use the bridge for switching purposes.

The occasional use of the bridge for switching purposes, such use not being made under claim of right on the part of the said defendant, and having been objected to by the plaintiffs, did not constitute a practical construction of the contract permitting the defendants to use the bridge for switching purposes.

Since the evidence shows that the said defendant, for a time at least, during the period of the contract, used the bridge temporarily and only occasionally for switching purposes, and did not claim the right to use it under the contract, but recognized its duty to re-establish its yard in such a manner as to make its use unnecessary, the plaintiffs are not estopped from now claiming that the defendants should be restrained from its further use.

The contention that since one of the defendants is a foreign corporation the court should not take jurisdiction and grant an injunction restraining the use of the bridge for switching purposes, cannot be sustained, for said defendant is doing business in this State and process was personally served upon it within the State, and under these circumstances, since a decree of a court of equity is *in personam*, the court will find no difficulty in enforcing its decree.

45

**706** NIAGARA FALLS INTERNATIONAL B. CO. *v.* GRAND T. R. CO.

Fourth Department, March, 1925.                    [Vol. 212

APPEAL by the plaintiffs, Niagara Falls International Bridge Company and another, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Niagara on the 21st day of November, 1923, upon the decision of the court rendered after a trial at the Niagara Trial Term before the court without a jury.

*Signor & Signor* [*Charles B. Wheeler* of counsel], for the appellants.

*Moot, Sprague, Brownell & Marcy* [*Adelbert Moot* and *S. Fay Carr* of counsel], for the respondents.

CROUCH, J.:

This action is brought to restrain defendants from switching cars and trains on the upper floor of the Steel Arch bridge over the Niagara river.

Plaintiffs are the owners of the bridge. Defendants occupy and use the upper floor under certain agreements in the nature of leases. The complaint alleges that the acts of defendants are contrary to the provisions of the agreements and to the purposes for which the bridge was designed and built; that they damage the bridge and imperil the safety of the public using it; and that plaintiffs have no adequate remedy at law. The answer puts in issue all of those allegations and further sets up estoppel, release and lack of jurisdiction.

The primary question for determination is the right or lack of right of defendants by contract or for equitable reasons to use the bridge for switching purposes. Its solution depends, we think, not alone upon the language of the writings involved, but also upon surrounding circumstances at several points of time and upon the acts of the parties over a long period.

Plaintiffs were incorporated in 1846, the International Company under the laws of New York, the Suspension Company under the laws of Canada. A bridge ultimately to give railway service was evidently contemplated, though such service was not afforded by the first bridge built in 1848. At that time the Great Western Railway Company was being projected without any definite terminus on the Niagara river. The bridge companies, after procuring certain amendments to their charters, began in 1853 and completed in 1855 the erection of what was known as the Suspension bridge. The New York company, under its charter, by itself or in union with the Canadian company, had power " to enter into any contract or agreement with any individual, railroad company or railroad companies, with reference to the terms of crossing locomotives and cars, passengers and freight over said railroad bridge." (Laws of 1853, chap. 622.) The Canadian company had substan-

tially the same power.   (Stat. Canada 1846, 10 Vict. chap. 112; Stat. Canada 1849, 12 Vict. chap. 161; Stat. Canada 1894, 57 & 58 Vict. chap. 98.)

Accordingly, under date of October 1, 1853, the two bridge companies entered into an agreement with the Great Western Railway Company, which, after reciting the building of the bridge " with two floors, the upper floor thereof being designed to pass railroad trains with locomotives, and the lower floor thereof for carriages, foot-passengers and animals; " and the further fact that the bridge was " of such strength and stability as to render it entirely safe and sufficient for the passage of heavy trains with locomotives," then leased and let to the railway company " the railroad floor and structure, including all its supports, fixtures and gates * * * to be for their entire use and under their control, for and during the continuance of their charter " for $45,000 a year.   It was provided that the railway company should keep in repair the floor, railway tracks and all structures and approaches, but " the strength and stability of the structure for railway purposes, as herein stated and described, shall be at the risk of " the bridge companies.

To make the agreement more explicit, the writing contained various covenants in the form of fourteen numbered paragraphs called articles.   Article 2 provided that " the upper railroad floor of the bridge and structure * * * are to be under the control and for the use of the parties of the second part [railway company] for railroad purposes."

Article 3 provided that the possession and use by the railway company was to carry with it the exclusive right to extend to other companies the privilege of crossing with locomotives, trains and cars, on such terms as they might agree to subject to the conditions and restrictions applicable, under the agreement, to the railway company.

Article 4 provided " that the privilege hereby conveyed * * * is for the purpose of passing locomotives and cars with freight and passengers, in the prosecution of legitimate railroad business " and persons other than railroad passengers were not to be permitted to cross or evade payment of toll to the bridge companies.

Article 10 reads as follows: " No railroad locomotive or train to cross the bridge at a greater velocity than at the rate of five miles per hour; and no locomotive or cars to stop or remain on the bridge in passing over."

Had the question of the right to use the bridge in switching operations arisen under this agreement shortly after the bridge was opened for traffic in 1855, there could have been but one

answer. While that specific use was not, in terms, referred to, it was clearly prohibited within all the language used and within all the intendments. The purpose of a bridge as such is to carry crossing traffic. The bridge companies were chartered to erect such a bridge. They were empowered to contract with railroads with reference to such a purpose. In so contracting, it was understood and recited that the bridge was designed and fit for that purpose. Even the rate of crossing was limited. When it was added that no locomotive or cars were to stop or remain on the bridge in passing over, the implication arising from the utility purpose became an express prohibition. The demise of the railroad floor for *railway purposes*, upon which some stress is laid by respondents, was not for all conceivable railway purposes, but for such railway purposes as were stated and described in the lease. That was the express language of the provision dealing with the liability of the bridge companies for the strength and stability of the structure.

Nor are we impressed with the argument which construes the phrase " stop *or* remain " as meaning " stop *and* remain," with its corollary that the prohibition related merely to the storage of cars on the bridge tracks. It may be that the purpose of the prohibition was in part to guard against setting fire to the wooden portions of the structure. If that was so, there was quite as much danger from a sudden stoppage by brakes, which would shake out coals, as from an engine stored there for a considerable time. But, as appears specifically from the strength and stability guaranty and generally from the entire agreement, the danger of stress and strain from either stopping or remaining was in the minds of the parties. To stop, as in a switching operation, was prohibited as well as to stop and remain, as in a storage operation.

The question, however, did not arise in 1855 nor for many years afterwards. Just when the bridge was first used for switching purposes does not appear.

In 1872 the parties made a supplemental agreement, which has no relevancy here.

In 1875, as a result of certain litigation in Canada, it was deemed wise to make a new agreement confirming the old ones and to apply to the Dominion Parliament for an act of confirmation. That agreement was made under date of February 27, 1875, and thereafter and on April 8, 1875, the Dominion Parliament passed an act (Stat. Canada 1875, 38 Vict. chap. 72) legalizing and confirming all three agreements. The agreement of 1875 increased the rent to $50,000, expressly saved the agreement of October 1, 1853, and contained a release to the railway company

from every demand of the bridge companies for and in respect of the use of the railroad floor of the bridge, save and except the rent. Whether that release indicates a claim to and settlement of damages for injuries to the bridge by reason of switching, or otherwise, does not appear. The reference therein to the future as well as to the past has no particular significance. The provision seems to have been an ordinary general release, which merely marked the close of one period and the beginning of another in the relations of the parties. It does appear, however, that the railroad business, which in 1853 was in its infancy, had been developing. A freight yard had grown up near the western or Canadian end of the bridge, and occasionally, at least, the switching trains ran out on the bridge. As there was but a single track on the bridge and as the dimensions of the cars and engines were small and the volume of traffic comparatively light, it is probable that the use was only occasional. There is some testimony relating to switching operations from 1876 down to 1896, when the Steel Arch bridge replaced the Suspension bridge, showing indefinitely some use of the bridge for that purpose when necessary. There is also testimony showing that the railway company toward the close of that period thought it desirable, if not legally necessary, to change the yard so as to avoid the use of the bridge for switching. A study made by one of the railway company's engineers in 1892 " moved the entire yard bodily to the west, so that a train could be switched out of the yard and not come onto the bridge."

Under date of March 30, 1896, the bridge companies entered into an agreement with the Grand Trunk Railway, the successor to the Great Western, by the terms of which the bridge companies agreed to build in place of the Suspension bridge a double-track steel arch bridge with an upper floor for the use of the Grand Trunk, in accordance with certain specifications therein referred to. The rent was increased to $59,000. The agreements of 1853, 1872 and 1875 were recited and it was provided that all provisions contained therein should remain in full force and be binding on the parties and applicable to the new bridge, except so far as they were expressly varied by this new agreement. We find no provision which expressly or otherwise varies the older agreements on the point under consideration.

The evidence shows that at about the time the new bridge was being built, the railway company made extensive changes in and additions to its freight yard. To the north and west of the old yard there was established what was known as the east-bound freight yard, where all east-bound freight trains were made up. The switching there was done entirely from the west end. To the

**710** NIAGARA FALLS INTERNATIONAL B. CO. *v.* GRAND T. R. CO.

Fourth Department, March, 1925. [Vol. 212

north and east of the old yard a series of switching and storage tracks for passenger cars were installed. This arrangement left the west-bound freight, and possibly passenger cars occasionally, to be switched from the east end of the old yard, which was near the west end of the bridge. The inference is that the railway company, in thus reconstructing its terminal, intended to use the new steel bridge in effect as part of its west-bound yard. That, so far as the express terms of the written agreements are concerned, it had no right to do.

But defendants contend (a) that the acquiescence by plaintiffs in the use of the old Suspension bridge for switching over a period of twenty years and perhaps more, amounted to a practical construction of the agreements, so as to permit it; and (b) that the parties having entered into the agreement of 1896 with knowledge of that usage and construction, plaintiffs are equitably estopped from claiming a breach.

We do not assent to those contentions. Even if it be conceded that the agreements are not clear on the point (*Kinney* v. *McBride & Co.,* 88 App. Div. 92, 100, 101) the evidence falls short of showing a practical construction, much less an estoppel.

To show a practical construction by acts there must have been conduct by the one party expressly or inferentially claiming as of right under the doubtful provision, coupled with knowledge thereof and acquiescence therein, express or implied, by the other. (*City of New York* v. *New York City Railway Co.,* 193 N. Y. 543; *Miller* v. *Clary,* 147 App. Div. 255; 6 R. C. L. 852, § 241; 13 C. J. 549; 2 Elliott Cont. 826.)

And to constitute an estoppel the one party must have been misled by the attitude of the other into a position withdrawal from which would cause injury or hardship. (*Parmely* v. *Showdy,* 86 Misc. 634, 640, and cases there cited.)

The evidence bearing on the extent of switching use down to 1896 is vague. It is true that all switching was done from the east ·end of the yard; but that does not mean, as respondents' brief puts it, that every switching movement into or out of the yard necessitated pulling the train out on the bridge. The witness on that point was asked whether the train in every operation had to pull onto the bridge. He answered: " Well, whenever it was necessary." There is nothing to show how often it was necessary or how often it was done. The impression left by all the evidence read in the light of the conditions then existing is that occasional use when necessary was made of the bridge. There is nothing to show or to warrant an inference that such use was made under any claim of right; or that the bridge companies knowingly acquiesced

therein.   Whatever inferences may be drawn are to the contrary, for there are facts which tend to show that the railway company intended only temporarily to use the new bridge for switching purposes, and hence made no claim of right.   Its engineers continued from time to time and even down to the trial to make surveys and studies looking toward a relocation of the west-bound yard which would avoid the necessity of using the bridge.   Moreover, there is nothing to show that the specifications for the new bridge, which were approved by the railway company, contemplated switching or made any allowance for additional strains caused thereby, as would have been the case had more than a temporary use been intended.   Indeed, the only evidence is to the effect that the bridge was not designed to withstand the strain of switching.   And later, when the question of the right came sharply up, the railway company rested its claim to right, not on practical construction or estoppel, but upon the literal language of specific provisions in the written agreements.   Other facts hereinafter referred to point in the same direction.

Following the agreement of 1896 and the completion of the new Steel Arch bridge is a period in the relations of the parties marked by the use of the bridge for switching purposes against the protests from time to time of plaintiffs.   As early as March, 1900, the bridge superintendent wrote the general manager of the railway company, calling his attention to the provision against stopping trains on the bridge and to violations thereof.   There is evidence of oral protests made to the yard superintendent.   In 1913 the railway company posted a notice in its office near the Canadian end of the bridge to the effect that no switching was allowed on the bridge.   In 1917 a letter of protest was sent to the president of the railway company, and in 1918, on the occasion of an accident, one was sent with a bill for damages to the railway superintendent.

In the summer of 1918 a periodical inspection of the bridge, followed by some ordinary maintenance work thereon, revealed a condition so dangerous as to make necessary a reconstruction. In October of that year a letter to the president of the railway company called attention to various recommendations made by the engineer of plaintiffs, including, among others, discontinuance of switching on the bridge.   In the course of subsequent negotiations between the parties, it appeared that counsel for the railway company had rendered an opinion that under the existing agreements the railway company had the right to switch.   Those negotiations eventuated in still another supplemental agreement between the parties made under date of May 23, 1919, covering the repair or reconstruction of the bridge and matters connected therewith,

increasing the rent to $80,000, and declaring that the former agreements and all their provisions should continue in full force, except as expressly varied by the new agreement. While the right to switch on the bridge was not, in terms, referred to in the agreement one way or the other, there were several provisions which seem incidentally to touch the matter. It was provided that the bridge companies in the work of reconstruction should interfere as little as possible with the railway traffic. The evidence shows that while that work was under way, both tracks on the bridge were left as long as possible to accommodate the railway company, and a small amount of switching was done. It was also provided that the railway company should forthwith remove an existing cross-over at the western end " as soon as the rearrangement of the Grand Trunk railway yards and trackage at the west end will permit." It is argued that this was tantamount to a grant of switching rights at the west end for as long as the railway company might desire. What connection the cross-over at the west end had with switching operations is not clear. The evidence of such operations shows simply the use of the northerly or west-bound track. In any event, the provision does not aid the railway company here, for it indicates a contemplated removal within a reasonable time, sooner rather than later, pursuant to a rearrangement of yards and trackage then apparently in process. Another provision was an agreement that no " pusher engine " should be used on the bridge. Finally, there was a provision that the bridge companies should forego all claims by them against the Grand Trunk for lack of care and overloading of the existing bridge and also all other claims for damages in connection with the bridge up to the then present time. In view of the position which the bridge companies had maintained on the switching question for many years, the exaction by the railway company of that release, taken together with the provisions for increased rent and a share in the cost of reconstruction, indicates at least a doubt as to the soundness of its claim.

In short, the most that the railway company may assert under the agreement of 1919 is that both parties were content to let the switching question remain open under their respective contentions. The essential thing at that time was to get to some agreement under which an unfit and dangerous bridge could be repaired and reconstructed.

That was done. Thereafter both the switching and the protests continued until this action was begun to secure a determination of the question.

In view of the facts above stated, there is no basis for any

argument on the theories of practical construction and equitable estoppel growing out of the acts of the parties from 1896 on. The bridge companies did not, either by word or act, recognize an asserted claim as of right by the railway company to switch on the bridge. So far as the evidence shows, no such claim was made until 1918. By posting a notice in 1913 forbidding employees to use the bridge in switching, it apparently admitted the contrary. If the bridge companies were under a duty to speak, they spoke. The most material fact to influence their actions was the effect on the bridge of its misuse. The serious condition from overloading was not definitely known until 1918. Nor is there anything to show that the railway company has been misled to its injury by the act or failure to act of the bridge companies. If it is now obliged to rearrange its yard and trackage, it will be doing only what it evidently has intended doing for some years past.

It may be added that the evidence disclosed the happening of four serious accidents on the bridge to through trains. Switching thereon, under such circumstances, adds nothing to the security of the structure or to the safety of the public which uses it.

One other point may be briefly referred to. It is said that the courts of this State have no jurisdiction to grant an injunction restraining the use of the bridge in Canada. It may be admitted that the legal title to the Canadian end of the bridge is in the Canadian company, and the New York end in the New York company. But their charters confer the power to build and operate the bridge together as they have done. There is a right of necessity, perhaps in the nature of an easement, in each. It is unnecessary now to determine that. Process was personally served in this State on the defendant Grand Trunk, a Canadian corporation. Because of its leasehold interest and of its business done in this State, it is present in the forum. Under those circumstances, since a decree in equity operates *in personam,* our court will find little difficulty in enforcing its decree. (*Salton Sea Cases* [*California Development Co.* v. *New Liverpool Salt Co.*], 172 Fed. 792; *Rickey Land & Cattle Co.* v. *Miller,* 218 U. S. 258; *Madden* v. *Rosseter,* 114 Misc. 416; affd., 196 App. Div. 891; and see note thereon in 30 Yale L. J. 865; Huston, Enforcement of Decrees in Equity, 81.)

We think upon all the evidence that the agreements between the parties never contemplated the use of the bridge for switching purposes; that such use is contrary to the intendments thereof; that the acts of the parties disclose no different intention; that (without a detailed discussion of the question) such use is to some extent harmful to the structure; that even though that were not

so, there would still be ground for injunctive relief (*Hammerstein Opera Co.* v. *Belasco*, 161 App. Div. 199; *Bartholdi Realty Co.* v. *Robard Realty Co.*, 156 id. 528; *Waldorf-Astoria Segar Co.* v. *Salomon*, 109 id. 65; affd., 184 N. Y. 584); that plaintiffs are not estopped by their conduct and have acted with due diligence; that they have no adequate remedy at law and are entitled to the relief prayed for.

The judgment should be reversed on the law and the facts, with costs, and judgment directed for plaintiffs as prayed for, with costs. Findings of fact Nos. 42, 43, 44, 49, 50, 53, 54, 55, 56, 57, 58, 62, 63, 64 are disapproved and reversed. Conclusions of law Nos. 4, 5, 7, 8, 10, 11, 12 are disapproved. Plaintiffs' requested findings of fact Nos. 10, 12, 15, 18, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 34, 35, 36, 37, 38, 39, 40, 41 and requested conclusions of law Nos. 1, 2, 3, 4 are found.

Hubbs, P. J., Clark, Davis and Taylor, JJ., concur.

Judgment reversed on the law and facts and judgment directed for plaintiffs as prayed for, with costs. Certain findings of fact and conclusions of law disapproved and reversed and new findings made.