**PORTSMOUTH BASEBALL CORPORA-TION, Plaintiff-Appellant,**

v.

**Ford C. FRICK, Commissioner of Baseball; Baltimore Baseball Club, Inc., et al., Defendants-Appellees.**

**No. 195, Docket 25659.**

United States Court of Appeals Second Circuit.

Argued Feb. 9, 1960.

Decided May 6, 1960.

**396**

James P. McGranery, Washington, D. C. (Leonard J. Emmerglick, Washington, D. C. and Garey & Garey, New York City, on the brief), for appellant.

Mark F. Hughes, New York City, (Baker, Hostetler & Patterson, Cleveland, Ohio, and Willkie Farr Gallagher Walton & Fitzgibbon, New York City, on the brief), for appellees.

Before MOORE, Circuit Judge, and SMITH and HERLANDS, District Judges.

HERLANDS, District Judge.

■ The question posed upon this appeal is: Does the broadcasting and telecasting of Major League baseball games into Minor League territory constitute an act of occupation or appropriation of such Minor League territory by the Major League teams, within the meaning of a certain agreement regulating the competitive territories between the Major and Minor Leagues and their teams? The issue is one of contract interpretation.

This breach-of-contract action was commenced on November 22, 1954.[1] The roots of the litigation, however, may be traced back to 1903, the year when the Major and Minor Leagues first agreed upon a rule regulating their respective circuits and territorial rights. That rule, known as Major-Minor League Rule 1, is the contract for breach of which plaintiff has brought this action to recover $250,000 damages.

Plaintiff is the corporate owner of a franchise to operate a Minor League baseball club in Portsmouth, Virginia. The nineteen defendants are: the Commissioner of Baseball; the American League of Professional Baseball Clubs (hereinafter the "American League") and its eight constituent clubs, and the National League of Professional Baseball Clubs (hereinafter the "National League") and its eight constituent clubs.

A national association, known as the National Association of Professional Baseball Leagues (hereinafter "National Association") represents the Minor Leagues. The National Association entered into a contract with the National League, representing the owners or operators of National League Baseball teams, and the American League, representing the owners or operators of American League Baseball teams.

One of the Minor Leagues represented by the National Association was the

1. Plaintiff unsuccessfully moved to amend the complaint by adding an antitrust conspiracy claim. Portsmouth Baseball Corporation v. Frick, D.C.S.D.N.Y.1958, 21 F.R.D. 318. Defendant Frick unsuccessfully moved to dismiss the complaint as to himself. Portsmouth Baseball Corporation v. Frick, D.C.S.D.N.Y.1955, 132 F. Supp. 922.

Piedmont League. Plaintiff was a member of the Piedmont League.

The contract between the Minor Leagues (represented by the National Association) and the Major Leagues (represented by the National and American Leagues) is known as the "Major-Minor League Agreement." This contract is supplemented by mutually agreed-upon formal rules, known as the "Major-Minor League Rules." The particular rule around which this case pivots is Major-Minor League Rule 1(a).

Major-Minor League Rule 1(a) must be kept in sharp focus because there are several other separate and distinct professional baseball agreements and rules which, however, do not regulate the relations between the Major and Minor Leagues. It is a necessary caveat that the identity and language of Major-Minor League Rule 1(a) is not to be confused with the provisions of other agreements and rules regulating the baseball business within the Major Leagues themselves [2] and within the Minor Leagues themselves [3] but not between the Major and Minor Leagues. Reference will be made to these other and different agreements (as well as to certain conversations and writings) only because one of plaintiff's basic arguments is that they supply competent evidence of a practical construction by the parties of the allegedly ambiguous language of Major-Minor League Rule 1(a).

The complaint, filed on November 22, 1954, accuses defendants with having continuously violated Major-Minor League Rule 1(a) from the spring of 1949 until the close of the 1954 baseball season. It charges that the plaintiff has suffered $250,000 damages caused by defendants' having "appropriated the territory of the plaintiff, * * * without compliance with the requirements of, and in violation of [Major-Minor League]

Rule 1–A." The complaint further alleges:

"By practical construction and application by defendants, Rule 1–A has been interpreted and applied to prohibit appropriation of territory by broadcasting by television and radio."

The complaint declares that defendants' violations of Major-Minor League Rule 1(a) "have included principally the broadcasting by radio and the exhibition through the medium of telecasting and television and rebroadcasting and retelecasting, of games played between Major League teams into the territory covered by the plaintiff's franchise, in violation of Rule 1–A."

The gist of defendants' position is that the terms of Major-Minor League Rule 1(a) are clear and unambiguous and that they do not relate to radio broadcasting or telecasting.

Plaintiff called as its witnesses the defendant Ford C. Frick, the Commissioner of Baseball, and Frank D. Lawrence, plaintiff's principal stockholder. Frick testified that the problem of broadcasting and telecasting has been a troublesome one ever since the development of television; and that during the years 1951 to 1954 there were Minor League complaints about telecasting of Major League games in or into Minor League territory.

Lawrence testified that, beginning about 1950, there was a drop in local attendance caused by the broadcasting and televising of Major League games within plaintiff's territory. The entire Piedmont League, of which plaintiff was a member, ceased operating in 1955.

Frick further testified that there had been correspondence between him and Lawrence on the subject of television and radio broadcasting, but that this correspondence did not result in an arbi-

---

2. For example, Major League Agreement (Plaintiff's Exh. 3); Major League Rule 1(d), in effect April 14, 1936 (Plaintiff's Exh. 5A) and amended October 15, 1949 (Plaintiff's Exh. 6); Television Agree-

ment among National League Clubs (Plaintiff's Exh. 9).

3. For example, National Association Agreement (Plaintiff's Exh. 61).

tration-compensation proceeding under Major-Minor League Rule 1(a). Frick told Lawrence (specifically, in January 1954) why he disagreed with the latter's assertion that it was a violation of Minor League territorial rights to broadcast or televise Major League baseball games into Minor League territory. The conversation is denied by Lawrence.

The correspondence between Frick and Lawrence is represented by eight letters (Plaintiff's Exhs. 12 to 19, inclusive). These exhibits silhouette the facts that, while Lawrence and Frick recognized the seriousness of the radio and television problem, Frick consistently claimed that they would not be permitted by the Antitrust Division of the United States Department of Justice to make any restrictive radio or television agreement; that the problem could not be solved until the Major League's own rules were revised to a point where they would be accepted by the courts and by Congress; that a Special Committee representing the Major and the Minor Leagues had been appointed to study the problem and to make recommendations concerning radio and television; and that the Department of Justice had turned down certain proposals suggested by the Commissioner of Baseball.

Elaborating the foregoing facts, Frick testified that, as a result of the attitude of Congressional Committees and the Department of Justice, he had told Lawrence that the only hope for solving the problem legally was through legislation; that efforts had been made by him and by counsel to obtain some clarification of the problem from the Department of Justice; and that the Department of Justice had threatened an antitrust action if Frick attempted to get the Major League clubs to agree to restrict broadcasting and telecasting.

We turn now to a detailed consideration of Major-Minor League Rule 1(a). The record contains three editions of that rule: the rule as it existed up to December 1946 (Defendants' Exh. C); the rule as amended in December 1946 (Plaintiff's Exh. 5B); and the rule as amended in January 1954 (Defendants' Exh. D).

The primary significance of the December 1946 and January 1954 amendments is largely of a negative nature; that is, despite the pendency of the broadcasting and telecasting problem and the parties' awareness of it, the said amendments related entirely to other matters. Moreover, the history of the rule is illuminating: it was first adopted in 1903, when radio and television broadcasting were non-existent and, hence, the parties' intentions cannot reasonably be said to have adverted to the broadcasting and televising of baseball games when they adopted the rule to define their respective territorial rights.

Major-Minor League Rule 1, as it read up to December 4, 1946, provided:

"Rule 1.

"Circuits.

"Protection of National Association Circuits.

"(a) No city in which a club of the National Association is located shall be included in the circuit of a Major League unless such league shall pay to the league in the National Association of which such city may be a member the sum of $5,000, and unless the Major League club in question shall pay to the Minor League club in the said city such reasonable compensation for damage to its assets as may be determined by agreement or fixed by the Commissioner.

"Protection of Major League Circuits.

"(b) To insure as far as possible the continuance of Major League baseball in cities now able to support it, the existing circuits of the Minor Leagues shall not be so changed as to include any city in a Major League circuit or any place within five miles thereof without the written consent of the league concerned."

The above rule, as amended and re-adopted in December 1946, preserved paragraph (b) intact, but amended paragraph (a) by changing the provision for the payment of reasonable compensation to be paid to a Minor League and a Minor League Club when the territory in which a Minor League franchise is being operated shall be included in a Major League. The 1946 amendment of paragraph (a) set up a procedure before a seven-man Board of Arbitration if the parties themselves could not agree upon the compensation.

Major-Minor League Rule 1(a), as amended in December 1946, provided:

"Rule 1.

"Circuits.

"(a) Protection of National Association Territory. No territory in which a Minor League franchise is being operated under protection of the Major-Minor League Agreement or National Association Agreement shall be included in any Major League until such Minor League and Minor League Club shall be paid such compensation as shall be mutually agreed upon as just and reasonable compensation for such action.

"In the event of disagreement as to what constitutes just and reasonable compensation for such action, the Major League desiring to occupy the Minor League territory shall notify the Commissioner of their desire and request that the just and reasonable compensation required to be paid, be determined by a board of arbitration. Upon receipt of such notice the Commissioner shall forthwith appoint a board of seven (7) men to consist of one (1) representative of the Minor League involved, one (1) representative of the Minor League Club involved, one (1) representative of the Major League involved, one (1) representative of the Major League Club involved, the President of the National Association, the Commissioner, and a sev-

enth party to be agreed upon by the aforementioned six or if they cannot agree on a seventh member then the Commissioner shall appoint a seventh member.

"The Commissioner shall designate a time and place for a meeting of such board which meeting shall be held within 30 days of the receipt by the Commissioner of request for appointment of such board.

"The board of arbitration shall after investigation and hearings determine the amount of just and reasonable compensation or other conditions under which the Minor League territory may be included in a Major League; and shall notify the interested parties within 10 days after reaching their conclusions. The findings of the board of arbitration shall be final and unless complied with by the Major League Club within thirty (30) days the territory shall remain Minor League territory.

"Within ten days after the findings of the board have been complied with, the Minor League territory shall be considered Major League territory and have territory protection provided in Paragraph B hereof."

The January 1954 amendment of Major-Minor League Rule 1(a) left paragraph (b) unchanged, but amended paragraph (a) by adding the following sentence:

"A Major League club desiring to acquire Minor League territory must file notice of its intention to do so with the Commissioner between October 1st and December 1st."

Major-Minor League Rule 1 was promulgated and adopted by the parties pursuant to the provisions of a contract known as the Major-Minor League Agreement. The first Major-Minor League Agreement was entered into in 1903 by the two Major Leagues and the National Association. The Major-Minor League Agreement (Plaintiff's Exh. 4)

in force at the times material to this litigation, was adopted in December 1951 and became effective on January 12, 1952 for the period from the latter date to January 12, 1957. It provides *inter alia* that, upon formal acceptance by the Major and Minor Leagues, any rules shall become binding upon them and shall not thereafter be amended "except by the concurrent action of said Leagues."

The phraseology of Major-Minor League Rule 1(a) unambiguously indicates that it applies only to the physical occupation of Minor League territory as distinguished from broadcasting or telecasting of Major League baseball games in or into Minor League territory. (1) The words that no Minor League territory "shall be included in any Major League" until certain compensation is paid does not logically pertain to a situation where a Major League game is broadcast from a station located in the territory of the Minor League club. (2) The provision relating to the situation where a Major League desired to "occupy" Minor League territory connotes physical occupation and does not reasonably convey the thought of broadcasting or televising baseball games in or into Minor League territory. (3) The expression "to acquire Minor League territory" indicates factually that the parties contemplated only physical occupation and acquisition of Minor League club territory by a Major League club. (4) Major-Minor League Rule 1(a) contemplates the complete physical occupation by a Major League club of a Minor League club's territory and not merely such a partial interference as might be involved in broadcasting in or into the Minor League club's territory. This is demonstrated by the last paragraph of Rule 1(a) which provides that, when an award of compensation has been duly completed and complied with, the Minor League territory shall be considered Major League territory and shall be protected as provided in Rule 1(b). Paragraph (b) provides that Major League territory cannot be invaded by a Minor League; hence, the Minor League club had no

rights whatsoever and would not be able to play at all in the territory thereafter occupied by the Major League club—a situation not obtaining when a Major League game is merely broadcast or telecast in or into Minor League territory. (5) The heading of the rule is "Circuits." Rule 1(b) is entitled "Protection of Major League Circuits." This shows that the rule refers to the territories in which clubs in a league carry on their physical operations and play their games and to changes in the make-up of these leagues and circuits.

■ Because Major-Minor League Rule 1(a) is clear and unambiguous, it cannot be stretched by resorting to an interpretation allegedly resulting from the subsequent conduct of the parties. Where, as here, the contract is plain and definite, the doctrine of practical construction does not apply. See Liebeskind v. Mexican Light & Power Co., Ltd., 2 Cir., 1941, 116 F.2d 971, 974; A & P Corrugated Box Corp. v. St. Regis Paper Co., D.C.D.Mass.1955, 134 F.Supp. 564, 570; Brainard v. New York Central R. Co., 1926, 242 N.Y. 125, 133, 151 N.E. 152, 45 A.L.R. 751; Heller & Henretig, Inc. v. 3620—168th Street, Inc., 1951, 302 N.Y. 326, 330, 98 N.E.2d 458; Gearns v. Commercial Cable Co., 1944, 293 N.Y. 105, 109, 56 N.E.2d 67, 153 A.L.R. 813; Restatement, Contracts, section 235(e), esp. Illustration 12, at p. 327; 3 Williston, Contracts, section 623, pp. 1793–1794 (rev. ed. 1936); Corbin on Contracts, section 542 (1951).

Out of abundant caution, the trial judge, acting on the assumption *arguendo* that evidence of practical construction was admissible, permitted plaintiff (over defendants' objection) to adduce proof of the parties' acts and writings supposedly constituting a construction of Major-Minor League Rule 1(a) in favor of a prohibition against Major League broadcasting from a station located in a Minor League club's territory. But the facts so adduced by plaintiff did not measure up to the controlling criteria of practical construction.

■ To show a practical construction by acts there must have been conduct by the one party expressly or inferentially claiming as of right under the doubtful provision, coupled with knowledge thereof and acquiescence therein, express or implied, by the other. Niagara Falls International Bridge Co. v. Grand Trunk Railway Co. of Canada, 4th Dept.1925, 212 App.Div. 705, 710, 209 N.Y.S. 79, modified on other grounds, 1925, 241 N. Y. 85, 148 N.E. 797; 3 Corbin on Contracts, section 558, p. 144 (1951).

The cases relied on by plaintiff are to be sharply distinguished from the factual situation herein. For example, in District of Columbia v. Gallaher, 1888, 124 U.S. 505, 8 S.Ct. 585, 31 L.Ed. 526, performance deviating from the terms of a construction contract had been "consented to by both parties" (124 U.S. at page 507, 8 S.Ct. at page 587). In Insurance Co. v. Dutcher, 1897, 95 U.S. 269, 273, 24 L.Ed. 410, a "uniform practice" followed by the defendant insurance company prior to the issuance of the insurance policy in question and continued for more than two years thereafter, was held to constitute a practical construction of the contract.

The record does not disclose a single instance where the defendants, by act or statement, agreed with or acquiesced in any Minor League assertion that the rule in question encompassed Major League broadcasting or telecasting into Minor League territory.

On the contrary, the evidence affirmatively demonstrated: (1) that the defendants consistently disputed the ex-

istence of plaintiff's claimed right to protection against Major League broadcasting and telecasting, for reasons that were stated to plaintiff; (2) that, despite the persistence and mutual awareness of the problem, the parties never amended Major-Minor Rule 1(a) to deal with that problem, although the rule was amended in other respects in December 1946 and in January 1954, and although the Major Leagues themselves [4] and the Minor Leagues themselves [5] dealt with the problem in their own respective league rules; (3) that, because a restrictive agreement concerning broadcasting and telecasting was subject to the danger of adverse Congressional Committee action and prosecution by the Department of Justice, the defendants' position expressed to the plaintiff was that the only sound solution was by legislation; (4) that in 1951, yielding to pressure from the Antitrust Division of the Department of Justice, the defendants rescinded their own rule (Major League Rule 1[d]) regulating broadcasting and telecasting; and (5) that the parties had not anticipated or contemplated the advent of radio and television when they first formulated Major-Minor League Rule 1(a) in 1903 and thereafter continued the same basic provision.

None of the acts and declarations of the parties in seeking a solution of the broadcasting and telecasting problem indicated an agreement that Major-Minor Rule 1(a) was already a contract covering it.

No doubt radio and television have had an adverse effect on attendance at base-

4. The two Major Leagues entered into a Major League Agreement (Plaintiff's Exh. 3) on November 1, 1946. This was a successor agreement to similar contracts executed on January 12, 1921, amended on December 12, 1944 and February 3, 1945. The 1921 contract created the office of Commissioner of Baseball. Pursuant to the Major League Agreement, Major League Rules were adopted by the Major Leagues for their own government.

Major League Rule 1[d]—as originally adopted (Plaintiff's Exh. 5A) and as

amended (Plaintiff's Exh. 6)—regulated broadcasting and telecasting. As the result of a Department of Justice investigation, this rule was rescinded in 1951.

5. The National Association Agreement (Plaintiff's Exh. 61), section 10.06(f) regulates broadcasting and telecasting by Minor League clubs in all Minor Leagues of all classifications. At the time of the trial herein, there were approximately twenty-eight Minor Leagues.

ball games, theatres and concerts. But this radical change in the manner in which the public chooses to be entertained cannot create contractual rights or obligations not within the fair intendment of the parties. The impact of radio and television has posed problems of policy and legality not contemplated when Major-Minor League Rule 1(a) was adopted.

While contracts may be interpreted with some elasticity to meet change and development during their existence, the contract herein was not adaptable to the drastic changes that have occurred. To apply the particular rule as covering broadcast and telecast competition would be to write a new contract beyond the parties' contemplation and intent. This cannot be done in the guise of judicial interpretation.

The trial court properly dismissed the action.

Affirmed.