Joseph SCADUTO, Plaintiff-Appellee,

v.

Anthony J. ORLANDO, d/b/a A. J. Orlando Contracting Co., Defendant-Appellant.

No. 114, Docket 28933.

United States Court of Appeals Second Circuit.

Argued Oct. 20, 1964.

Decided Jan. 12, 1965.

Certiorari Denied April 26, 1965.
See 85 S.Ct. 1341.

George H. Foley, Boston, Mass. (S. Donald Gonson, Hale & Dorr, Boston, Mass., on the brief), for defendant-appellant.

Leo H. Raines, New York City (Lawrence C. Gutman, Raines & Gutman, New York City, on the brief), for plaintiff-appellee.

Before FRIENDLY, KAUFMAN and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge.

The defendant, Anthony J. Orlando, a road builder, entered into a contract in April of 1955 with the Massachusetts Turnpike Authority to construct 4.89 miles of the Massachusetts Turnpike in the Towns of Brimfield and Warren. On July 15, 1955 in New York City, Orlando made a subcontract in writing with Sca-

duto Bros. Trucking, Inc. (Scaduto Bros.) under the terms of which, at certain rates per cubic yard, Scaduto Bros. agreed to excavate and remove an estimated 350,000 cubic yards of rock, ledge and boulders from the 4.89 mile section. This was a non-exclusive contract, for Orlando did some of the rock work himself, and he had made subcontracts with at least three others at various times to do portions of it.

Section 1 of the subcontract between Orlando and Scaduto Bros. required the latter "to furnish all labor, materials and equipment necessary" and it agreed "to perform all work as described in Section No. 2 hereof * * *." Section No. 2 stated the categories of work to be done in very general terms and specified the price per unit for each category.[1] Section 1 also recited that the work to be done was "in connection with the construction of Contract No. 51–053 for Massachusetts Turnpike Authority" and went on to provide:

"This work is to be done in accordance with the Contract Documents and General Conditions of the Contract between the Contractor and Massachusetts Turnpike Authority, all of which Special Provisions, General Conditions, Drawings, Specifications, Amendments and Addenda signed by the parties thereto form part of a Contract between the Contractor and Massachusetts Turnpike Authority for the construction of the project mentioned above and hereby become a part of this Agreement."

---

1. Section 2 of the Subcontract reads as follows:

"SECTION No. 2: The CONTRACTOR and the SUBCONTRACTOR agree that the work to be done by the SUBCONTRACTOR is as follows and at the unit price or prices specified herein.

| | |
|---|---|
| Class A Rock Excavation | at $1.50 per cu. yd. |
| Class B Trench Rock drilled and blasted only | at $1.50 per cu. yd. |
| Boulders drilled and blasted ONLY in any | at $ .75 per cu. yd. |

For any earth excavation incidental to the above or which the SUBCONTRACTOR may do by agreement at $ .42 per cu. yd. Where some of the work has been partially performed, between station and station , the SUBCONTRACTOR shall complete the work necessary to conform to the Plans and Specifications at the rates above provided."

It is the appellants, Orlando's, claim that this last quoted clause incorporated by reference all of the specifications of the prime contract having to do with excavating and removing rock [2] and with constructing embankments with rocks.[3] The subcontract provided in Section 3 that the measurement of work completed by Scaduto Bros. should be computed on the basis of the quantity of work which the Massachusetts Turnpike Authority determined as having been performed by Orlando, which it agreed to accept as correct, less any portion of the work which Orlando himself had performed.[4] Section 12 estimated the amount of the

2. Section A2.12 of the Specifications reads in pertinent part as follows:

"A2.12 Class A Rock Excavation.

"This item shall include the removal and satisfactory disposal of all ledge or stone that requires blasting for its removal when such material is encountered within the limits of roadway excavation (Subsection A2.10) or in channel excavation (Subsection A3.14).

"It shall also include the removal of boulders of 1 cubic yard or more in volume. Boulders measuring ½ a cubic yard or more which require blasting for their removal will also be included in the item for Class A Rock Excavation * * *."

Section A2.32 of the Specifications reads in pertinent part as follows:

"A2.32 Class A Rock Excavation.

"The work of Class A Rock Excavation shall be performed in accordance with the requirements specified above in Subsection A2.30, with the following additional requirements:

" * * * All rock shall be excavated to the cross section and elevations shown on the plans with no rock projecting above the elevation of subgrade or inside the neat slope lines of the required cross section. The operation shall be so conducted as to effect drainage to the ditches and not leave undrained pockets in the surface of the rock. Care shall be taken to avoid overshooting when blasting and any loose shattered rock, loosened boulders, or overhanging ledges, either on or outside the required cross section, shall be removed. All rock slopes shall have reasonably uniform faces.

"All rock shall be used in construction of embankments unless otherwise directed by the Engineer, and it shall be excavated in such size and manner as to permit its use for that purpose * * *."

Section A2.30 of the Specifications reads in pertinent part as follows:

"A. Sequence of Operations. The sequence of all excavation operations shall be such as to insure the most efficient utilization of excavated materials in embankment (as specified in Section A–5) and the use of a minimum amount of borrow * * *."

3. Section A5.36 of the Specifications reads in pertinent part as follows:

"A5.36 Embankment Construction with Rock.

"The plan and sequence of grading operations shall be such as to make use of all Rock to be obtained from excavation or borrow in accordance with the following provisions * * *."

Section A5.41 of the Specifications reads in pertinent part as follows:

"A5.41 Basis of Payment.

"This work will be paid for as follows:

"The formation of embankments, including the layer of Select Material, as specified above will be included in the item for the particular kind of excavation specified when the material is obtained within the location or the slope lines, or in the item for Ordinary Borrow if the material is obtained outside of the location or slope lines, and the contract unit prices for the aforesaid items shall constitute full compensation for the satisfactory performance and completion of the entire work * * *."

Section A12.41 of the Specifications reads in pertinent part as follows:

"A12.41 Basis of Payment.

"Payment for all grading, rolling and finishing of surfaces herein shall be included in the contract prices for the various items scheduled in the Proposal."

4. Section No. 3 of the Subcontract reads in pertinent part as follows:

"SECTION NO. 3:

"BASIS OF MEASUREMENTS: All work acceptably completed under this contract will be measured by the MASSACHUSETTS TURNPIKE AUTHORITY or its authorized assistants according to Standard measures, and the quantities of work performed shall be computed, based on such measurements. The SUBCONTRACTOR shall accept as correct the quantities which the MASSACHUSETTS TURNPIKE AUTHORITY shall allow to the CON-

work and specified that the work was to be commenced by August 1, 1955 and completed by December 31, 1955.[5]

There were other provisions of the subcontract, which included the furnishing of a bond by Scaduto Bros., rights and powers of the prime contractor if claims were made or liens were filed by creditors of the subcontractor, or if there were a default by the subcontractor, as well as certain provisions which have no special bearing on the issues of the case.

Scaduto Bros. commenced work on the Massachusetts Turnpike about the middle of July, 1955. It was paid at the contract price each month pursuant to monthly estimates made up by representatives of itself, the Massachusetts Turnpike Authority and Orlando. The quantity of rock required to be excavated and removed greatly exceeded the forecast of 350,000 cubic yards so that by mutual consent of the parties the subcontract was continued beyond December 31, 1955 and Scaduto Bros. remained at work there until June, 1956. It was paid in full on the March estimate for work done through February 14, 1956. It is apparent that shortly after this date Scaduto Bros. experienced some difficulty in paying its bills. It had endeavored to save expense in connection with the Massachusetts Turnpike work by making an arrangement with a private owner of adjacent land to dump excavated rock on the owner's land and thus "waste" it rather than deliver it to an embankment site, perhaps two or three miles away.

The appellant, Orlando, concedes that he permitted Scaduto Bros. to waste rock in this fashion, but only on condition that it subject itself to a proportionate amount of the deduction which the Massachusetts Turnpike Authority would make in its payments to Orlando because of the rock not delivered to embankments. In late February and March of 1956 creditors of Scaduto Bros. were pressing it for payment and were making demands on Orlando for payment of Scaduto Bros.' obligations. Orlando paid some of these as advancements to Scaduto Bros. out of the April estimate and deducted about $34,000 for an alleged failure to take rock to embankment sites which Orlando claimed was the proportionate part of the $110,000 which the Massachusetts Turnpike Authority had withheld from him for incompleted embankments. On May 14th and 17th he sought to get an agreement from Scaduto Bros. to let him pay off the most pressing of Scaduto Bros.' creditors out of $75,000 which Orlando asserted was substantially all of the net amount due from him to Scaduto Bros. on the April and May estimates. Agreement on this proposal was never reached and the money was never used to pay any of Scaduto Bros.' creditors, but Orlando nevertheless continued to withhold it. This amount was in addition to the $34,000 retained in April.

Orlando, both before and after the discussion concerning the assignment of $75,000 to pay Scaduto Bros.' creditors, also justified retaining any sums earned by Scaduto Bros. on the alternative ground that such creditors were making claims directly against him, Orlando, as the prime contractor, and that under Section 4 of the subcontract he had the right to retain enough to indemnify him-

TRACTOR, less any portion of this work which may have been performed by the CONTRACTOR."

5. Section No. 12 of the Subcontract reads as follows:
"SECTION NO. 12. The work is to consist primarily of excavating and removing approximately 350,000 cubic yards of rock and is to commence not later than August 1, 1955 and to be completed not later than December 31, 1955.
"If the SUBCONTRACTOR'S work is not completed by December 31, 1955 and as a result thereof the CONTRACTOR incurs any penalties for failure to meets [sic] its performance dates, the SUBCONTRACTOR shall indemnify CONTRACTOR against such penalties."

self against these claims.[6] Orlando therefore withheld from Scaduto Bros. all sums it had earned and continued to do so with the May estimate. Scaduto Bros. began taking equipment off of the job and discontinued all its work there by June 11, 1956. Meanwhile, thirteen suits by Scaduto Bros.' creditors were brought against Orlando although all were eventually dismissed.

Scaduto Bros. petitioned for reorganization under Chapter 11 of the Bankruptcy Act; and the appellee, Joseph Scaduto, a guarantor on the performance bond of Scaduto Bros., was assigned the claim of the trustee in bankruptcy against Orlando. Joseph Scaduto brought the present action in two counts: the first alleged breach by Orlando of the subcontract in failing to pay for the work performed, and the second alleged that Joseph Scaduto, as the principal investor in Scaduto Bros. Trucking, Inc., suffered the loss of his investment and became liable for the corporation's debts because of Orlando's breach of the subcontract. Orlando counterclaimed for the cost of completing the unfinished work covered by the contract and for his expenses, including attorney's fees.

The court below held that the specifications of the prime contract never became a part of the subcontract; that Scaduto Bros. was not required to do grading or embankment work but was obligated only to excavate rock and haul it away under the direction of Orlando's engineer; that it performed the work required of it and was owed $174,978.11 with interest of $73,013.40. It also held that Orlando had no right to retain as indemnity, pursuant to Section 4 of the subcontract, any amount due because of claims of Scaduto Bros.' creditors against Orlando either directly or by way of the prime contractor's bond. The counterclaim was dismissed.

The evidence in the case was sharply conflicting and the findings of the trial court would ordinarily stand, but the court's finding in this case that the plans and specifications of the defendant's master or prime contract with the Massachusetts Turnpike Authority were not included and made a part of the subcontract between defendant and Scaduto Bros. cannot be sustained. Apparently this finding is based upon the facts that neither Scaduto Bros.' attorney nor Orlando's attorney, at the meeting of the parties where the subcontract was entered into, saw the related plans and specifications of the prime contract, and that Orlando said at the time that the plans and specifications were the concern of the prime contractor. In effect, the court held that there was no meeting of the minds regarding this provision in the contract and that therefore it must be excised. But this is not, and the parties have not claimed that it is, an equitable action seeking reformation of a contract because the contract itself or certain provisions in it were entered into through fraud, accident or mistake. 3 Corbin, Contracts, § 540 (1961); 5 Williston, Contracts, § 1548 and § 1549 (1937). The clause of the subcontract which incorporated the prime contract's specifications, relating to rock excavation and removal, was clear and unambiguous. There was no reason to admit parol evidence to change its terms, nor was there any evidence by way of practical construction by acts of the parties which tended to show an agreed exclusion of the incorporation by reference clause. Portsmouth Baseball Corporation v. Frick, 278 F.2d 395, 400 (2d Cir. 1960). 3 Corbin, Contracts, § 573 (1960); 4 Williston, Contracts, § 631 (3rd ed.

---

6. Section No. 4 of the Subcontract reads in pertinent part as follows:

"* * * If, at any time, there shall be evidence of any lien or claim for which, if established, the CONTRACTOR might become liable and which is chargeable to the SUBCONTRAC-TOR, the CONTRACTOR shall have the right to retain out of any payment due or to become due an amount sufficient completely to indemnify the CONTRACTOR against such lien or claim. * * *"

1961); Restatement, Contracts, § 237. The subcontract was signed by Philip Scaduto, as president of Scaduto Bros. Trucking Inc., and, absent evidence to the contrary, he presumably knew that the clause was in the agreement. Moreover, it was necessary for an understanding of the subcontract to refer to the plans and specifications because, standing alone, the subcontract did not reveal where the job was located, what materials were to be removed, the manner in which a cut was to be made, and other essential details. For example, the specifications were needed to define and explain certain terms in the subcontract which without them would have been meaningless, such as "Class A Rock Excavation" and "Class B Trench Rock."

■ In concluding that the subcontract incorporated by reference certain plans and specifications of the prime contract, we limit those incorporated to those which relate to drilling, blasting, excavating and removal of rock and any earth excavation incidental to those activities. The specifications of the prime contract which relate to these are A2.12 and A2.32. The appellant argues that all specifications in the prime contract concerning rock and its uses in the construction of the highway became incorporated in the subcontract, and that it was therefore part of Scaduto Bros.' duty to construct embankments. We do not think the agreement can be so construed. The incorporated specifications are only for the purpose of explaining, detailing and clarifying the work, and the way it should be done. The plans and specifications cannot be construed to add items or kinds of work not mentioned in Section 2 of the subcontract. Section 1 provides that "this work is to be done in accordance with * * *" the specifications of the prime contract relating to it, i. e., it says how the work shall be done but does not enlarge the kind or nature of the work. Reading into the description of "work" in the subcontract a duty to build embankments goes way beyond the bounds of definition and clarification and beyond anything which can reasonably

be implied from the wording of the subcontract. Its terms certainly imply "removal" as a part of excavation and this is corroborated by Section 12 where it says "The work is to consist primarily of excavating and removing approximately 350,000 cubic yards of rock * * *."

The issue of "removal" and the ancillary question of "wasting" of excavated rock by Scaduto Bros. are the bases of one of Orlando's claims of justification for retaining payments due to Scaduto Bros. under the April and May estimates. Sections A2.12 and A2.32 of the specifications in the prime contract make it clear that the person excavating rock had the duty to remove and deposit it where it would be available for use in building embankments. In interpreting the specifications of the prime contract it is to be borne in mind that their principal purpose is to particularize items and procedures which the Massachusetts Turnpike Authority required of the prime contractor, who was still responsible to the Authority for compliance with them. The subcontract did not, however, operate as a relegation to Scaduto Bros. of all the duties relating to excavated rock which Orlando owed to the Massachusetts Turnpike Authority, as appellant seems to claim. Prime contract specifications A2.12 and A2.32 relating to Scaduto Bros.' subcontract only apply to the subcontract to the extent that they teach how the work agreed to be done in the subcontract should be performed, so that the work of the subcontract will properly implement the prime contract and be cooperatively integrated with the project which it concerns.

■ If any doubt existed as to the scope of the work to be performed by Scaduto Bros. and the way in which the specifications required the work to be done, that doubt must be resolved in favor of Scaduto Bros., first, because the subcontract was Orlando's own form of agreement, which he had drafted, and the doctrine of *contra·proferentem* applies, Heating Maintenance Corp. v. State of New York (Ct. of Claims), 206 Misc. 605,

134 N.Y.S.2d 71 (1954); Moran v. Standard Oil Co., 211 N.Y. 187, 105 N.E. 217 (1914); and, second, because the specifications were drafted in the first instance with the intent and purpose of clarifying and implementing the description of Orlando's duties to the Massachusetts Turnpike Authority under the prime contract.

Orlando argues that the prime contract gave him $1.75 per cubic yard for excavated rock as formed in embankments with graded and finished slopes, that it is unlikely that Scaduto Bros. could get from Orlando $1.50 per cubic yard for simply drilling, blasting, excavating and removing the rock to the embankment site and that it must therefore have been understood that Scaduto Bros. was obligated to build embankments and grade and slope them as well. But this is only counsel's statement; there is nothing in the record to show whether the twenty-five cent difference was ample to cover the work of forming and grading and sloping or not.

The trial court proceeded upon the assumption that no part of the plans and specifications of the prime contract was included or made a part of the subcontract. This court cannot from the record ascertain what view of the evidence the trier of fact might have taken if certain of the specifications of the prime contract had been considered a part of the subcontract and had been given proper force and effect.

It may well be that, in spite of the trial court's erroneous assumption that none of the plans and specifications of the prime contract had any bearing on the case, Scaduto Bros., in performing what the trial court stated the parties intended and agreed, in fact did the work in the way the specifications required. The trial court concluded that the parties to the subcontract "intended and agreed that the Scaduto Corporation should haul and cart away rocks, boulders and earth excavations subject to the directions of Gandolfo," Orlando's engineer. Under the specification A2.32 the engineer for the Massachusetts Turnpike Authority could direct that excavated rock be removed to somewhere other than an embankment site. Presumably he would give such an order through .Orlando's engineer. As a general rule Scaduto Bros. was to remove the rock to sites where it would be available for embankment work, but there was evidence that Orlando and Scaduto Bros. agreed that the latter might "waste" rock if Scaduto Bros. would share a proportionate part of any withholding by the Massachusetts Turnpike Authority for shortage of embankment material. There are no findings relative to Scaduto Bros.' compliance with its duty to deliver excavated rock to embankment sites, or what orders were given by the engineers or why and under what circumstances rock was "wasted," or what part, if any, this played in the $34,000 withholding. These things may be more particularly determined on remand.

One of the two principal claims of the appellant is that he withheld $34,000 pursuant to such an agreement after the Massachusetts Turnpike Authority withheld $110,000 from him for a portion of the 4.89 miles, where embankment material was short. Scaduto Bros. denies this, but asserts that even if it is so, Orlando eventually was fully paid by the Massachusetts Turnpike Authority but that he did not pay Scaduto Bros. Whether this was arbitrary or because Orlando himself completed the work which Scaduto Bros. should have done is not clear.

If Scaduto is found to have defaulted in carrying out the subcontract, a question arises as to the extent to which Oralndo was justified in indemnifying himself for being required to make up for Scaduto Bros.' deficiencies. The District Court will have to determine to what extent, if any, Scaduto Bros. failed to discharge its obligation under the subcontract, properly construed, at the time of termination.

 Absent such right to indemnification, the appellant advances an additional basis, his second principal claim on this appeal, to justify his withholding.

of payments for what Scaduto Bros. had earned under the April and May estimates, and that is that creditors of Scaduto Bros. were making claims directly against Orlando and threatening to sue and actually suing him or making claims against his bond as prime contractor. He asserts the right to withhold under the provisions of Section 4 of the Subcontract which permit such withholding where there is "evidence of any lien or claim for which, if established, the CONTRACTOR might become liable and which is chargeable to the SUBCONTRACTOR, * * *." The trial court found that the claims of creditors to which the appellant referred could not, under well established Massachusetts law, have been maintained against Orlando as the prime contractor because "ordinarily a person not a party to a contract may not sue on it." There was nothing in the bond in the present case which showed an intention to benefit suppliers or other creditors of the subcontractor.[7] The bond, therefore, could not form the basis of a common law obligation, enforceable against the maker by such suppliers or creditors, in the absence of provisions evidencing a specific intention to benefit the class of supplier or creditor seeking enforcement. The narrow range of obligees and beneficiaries of both common law and statutory bonds was well established in Massachusetts decisional law at the time of the withholding. See Central Supply Co. v. United States Fidelity & Guaranty Co., 273 Mass. 139, 173 N.E. 697 (1930); Johnson-Foster Co. v. D'Amore Construction Co., 314 Mass. 416, 50 N.E.2d 89, 148 A.L.R. 353 (1943); Claycraft Co. v. John Bowen Co., 287 Mass. 255, 191 N.E. 403 (1934). In addition the trial court found on sufficient evidence that Orlando was amply secured and retained sums greatly in excess of what was needed for his announced purpose.

The clause in Section 4 which Orlando invokes that he "might become liable" must be construed to mean that the prime contractor may withhold payments earned by the subcontractor only if an attorney could reasonably consider that there was a substantial risk of liability. If the prime contractor could withhold payments whenever there was a claim for which he might conceivably become liable, his slightest subjectively generated fear could compel the subcontractor to default. The right to withhold a progress payment for work performed by a subcontractor may only be exercised where circumstances clearly warrant it, because in most instances the installment payment is vitally needed by the subcontractor to carry out his obligations under the contract. An unjustified withholding may give the subcontractor the right to renounce the subcontract. 3A Corbin, Contracts, § 692, at 269 et seq. (1960). There is nothing in the circumstances of this case or the applicable law which reveal error in the trial court's determination of this issue.

On rehearing the trial court will have the problem of giving effect to the plans and specifications of the prime contract as incorporated by reference into the subcontract and will hear evidence of what the parties did with regard to their relative rights and duties under the subcontract with the pertinent plans and specifications included. Whether either of the parties defaulted under the contract, or caused the default of the other, or waived any rights under it, as well as the questions raised by the appellant relative to his cross-complaint, must be left for determination by the trial court.

The judgment below is set aside and the case is remanded for further proceedings consistent with this opinion.

---

7. The terms of the bond in this case are discussed in Waite Hardware Co. v. Ardini & Pfau, Inc., 339 Mass. 634, 162 N.E.2d 13, 14 n. 1 (1959) which was decided three years after the withholding in question. The same bond is also referred to in People ex rel. Rice v. Graves, 242 App.Div. 128, 273 N.Y.S. 582 (1934), aff'd 270 N.Y. 498, 200 N.E. 288 (1936).