Clare J. Hoyt, J.
In this action brought to determine plaintiff’s claim to real property (Real Property Law, art. 15, now Real Property Actions and Proceedings Law), a detailed statement of facts is necessary since they encompass a period from 1901 to 1959, the date of the commencement of the action.
Plaintiff is a domestic corporation succeeding, by merger and change of name, the Haverstraw Water Supply Company (hereinafter called “ Haverstraw ”), a corporation organized in 1901 under the Transportation Corporations Law for the purpose of supplying water to municipalities and the inhabitants thereof in New York State. At its inception, Haverstraw secured franchises from the Town of Stony Point and the Villages of Haverstraw and West Haverstraw in Rockland County, which franchises are still in effect.
The defendant is a body corporate created by compact between the States of New York and New Jersey in 1937, succeeding to the interests of the Board of Commissioners of Palisades Interstate Park, created in 1900, and hereinafter called “ Commissioners ”.
Plaintiff and its corporate predecessors have since 1901 owned and operated a public water supply plant and system known as its Haverstraw Plant consisting of the franchises and distribution system acquired and constructed by Haverstraw. Water is furnished for domestic, industrial, municipal and fire protection purposes under the franchises. The principal source of water for this plant has .been and continues to be the Stony Point Station. Other and lesser sources of water for the Haverstraw Plant are springs and wells at Thiells and a deep well at Garnerville, all in Rockland County.
The Stony Point Station is located alongside Tiorati Brook, formerly known as Cedar Pond Brook, from which water is pumped into the distribution system. A reservoir, known as the lower one, having a capacity of 4 million gallons is formed by a dam in the brook. A smaller reservoir has been constructed beside it and a few feet higher, having a capacity of 1.2 million gallons. Water is pumped from the lower reservoir into the upper one, which serves as a settling reservoir and then flows into the pumping station where it is forced into the distribution system. These facilities were in operation in 1914, a date that becomes important, and were augmented thereafter by a reservoir on a nearby hill having a capacity of 1.25 *1016 million gallons. Only about one half of the storage capacities of these installations is available for distribution in the system because of the need to maintain pressure and because of the turbidity that exists in the lower levels of the reservoirs.
At the commencement of this action in 1959 the average daily production of the Haverstraw Plant was about 1.3 million gallons, about three fourths of which was produced by the Stony Point Station. In 1963 the average daily production had risen to approximately 1.5 million gallons for the Haverstraw Plant and 1 million gallons for the Stony Point Station. The Stony Point Station’s rated capacity is 1 million gallons per day and it is capable of producing 15% in excess thereof.
From June to October in each year the demand for water is at its height and frequently during this period little or no water flows down Tiorati Brook. Tiorati Brook is the sole source of water for the Stony Point Station. Tiorati Brook, although fed by some tributaries, has as its principal source of water the overflow from Lake Tiorati, situate up the brook some 6 or 7 miles. It is plaintiff’s contention, resisted by defendant, that it has the right to withdraw waters from Lake Tiorati when the level of the lake is not high enough to run over the spillway in the dam. This is the issue in this litigation.
Lake Tiorati is a man-made body of water resulting from a dam erected in 1914 by the Commissioners. The lake has an area of 288 acres, a capacity of 1,397 million gallons and an elevation at its spillways of 1,030 feet. (All elevations herein are expressed in feet above mean high water at Sandy Hook in accordance with the 1914 datum; 2.45 feet should be added to express elevation according to the U. S. Gr. S. datum based upon mean sea level.) The construction of the dam and its impounding of waters inundated Big Cedar Pond and Little Cedar Pond and surrounding lands.
In 1907 Rockland County Realty Corporation, hereinafter called “ Rockland ”, a corporation controlled by one Martin Driscoll who also controlled Haverstraw, acquired a parcel of land containing 664 acres, known as the Cedar Pond Furnace Lot, which embraced most of Big Cedar Pond and some surrounding lands. It did not include, as claimed by plaintiff, all of Big Cedar Pond and a portion of Little Cedar Pond. These ponds, about 1,500 feet apart, had a combined area of 98 acres and a capacity of 208 million gallons. Both ponds were natural basins with no dams or other improvements. They had elevations of approximately 1,012 and 1,014 feet respectively. Little Cedar Pond flowed into Big Cedar Pond and the latter became the source of Cedar Pond Brook, now known as Tiorati Brook. *1017 Rockland upon its acquisition of these lands leased them to Haverstraw for a 10-year term.
In 1910 Mary W. Harriman conveyed to the Commissioners 10,000 acres of land for park purposes, some of which lands adjoined the Cedar Pond Furnace Lot previously conveyed to Rockland. In addition, a gift of $1,000,000 was made by Mrs. Harriman to the Commissioners to acquire other lands for park purposes. The Harriman conveyance included a portion of Big Cedar Pond as it then existed and lands to the north thereof and the Commissioners, in addition, acquired from the Cunningham Estate lands to the southwest of the Cedar Pond Furnace Lot which lands embraced Little Cedar Pond and the lands surrounding it.
On July 25, 1914 Rockland agreed to sell its 664-acre parcel to the Commissioners. Simultaneously therewith, Haverstraw entered into an agreement with the Commissioners, the interpretation of which determines the rights of the parties herein.
Considerable evidence was produced as to what Haverstraw did with these ponds under its lease before entering into the 1914 agreement. Plaintiff asserts that Haverstraw erected a dam in 1911 in Cedar Pond Brook at the approximate location of the present dam which created Lake Tiorati. It is claimed that this old dam had an elevation of 1,018.1 feet at its spillway and that it formed from the two natural ponds a new body of water having an area of 180 acres and a capacity of 425 million gallons. Defendant asserts that the evidence shows no such body of water was ever impounded. From all the evidence, the court finds at most that a stone dam was in existence at or near the present dam site in 1914, that Haverstraw had made expenditures for a gate in the dam and that a spillway was constructed at the claimed elevation. There is no evidence, however, that the dam was ever put in operation or that any waters were ever impounded thereby. On the contrary, the evidence establishes that the first flooding of the old ponds resulted from the dam built by the Commissioners after acquiring title from Rockland. In arriving at this determination the court has considered along with other evidence defendant’s Exhibit BG- for identification and has admitted said exhibit in evidence on defendant’s motion, decision having been reserved thereon at the trial.
The contract of sale between Rockland and the Commissioners, dated July 25, 1914, for “ The Cedar Pond Furnace Lot ” provided for a closing not less than 20 days from the entry of an order by the Commissioner of Health of the State of New *1018 York removing from the premises that were the subject of the contract restrictions as to their use. In 1910 the New York State Board of Health had promulgated rules and regulations for the protection of Haverstraw’s water supply from Cedar Pond and Cedar Pond Brook which regulations were applicable to the entire watershed of Cedar Pond and Cedar Pond Brook. These rules .prohibited, inter alia, boating, bathing, fishing and ice cutting in Cedar Pond and Cedar Pond Brook. If such restrictions were not removed within one year the agreement provided that either party had the power to terminate it. The agreement recited that the intended use of the premises by the Commissioners was inconsistent with the regulations then in effect by the New York State Department of Health and that it was intended that these restrictions would be revoked in the manner specified in an agreement entered into simultaneously between Haverstraw and the Commissioners. Rockland undertook to procure the execution by Haverstraw of any instruments and the performance of whatever was necessary or advisable to effect the release by the New York State Department of Health of the restrictions.
We now turn to the agreement between Haverstraw and the Commissioners also executed on July 25, 1914. Recitals therein state that Haverstraw owns and is in control by lease of a water supply system supplying water to certain communities for commercial and domestic uses; that one of the sources of supply of water used by Haverstraw is Cedar Pond and the stream flowing therefrom, Cedar Pond Brook, which water is drawn from the brook at its Stony Point Plant; that the entire watershed of Cedar Pond and Cedar Pond Brook has been defined by the New York State Board of Health as comprising part of the watershed of Haverstraw’s water supply and the use of the same has been restricted by said Board of Health; that Haverstraw leases from Rockland Cedar Pond and the lands adjacent thereto for the purpose of said water supply and that Haverstraw intends to surrender its lease so that the land, stream, and pond may be sold to the Commissioners; and that the Commissioners “ intend [s] to enlarge the storage basin of Cedar Pond whereby a better and increased supply of water will be insured to [Haverstraw].”
Upon these recitals and in consideration of the mutual promises, the Commissioners agreed:
“ 1st # * * at its own expense to enlarge the storage basin of said Cedar Pond by erecting a proper dam which will raise the height of the said Cedar Pond at least four feet above' its prsent level, and it agrees after said dam is completed to *1019 do nothing which will interfere or lessen the natural flow of water into and out of the said pond. And it further agrees not to divert any of the waters flowing into or out of the said pond. And it agrees after the said dam has been built to keep the same in reasonable repair. The work of construction of said dam shall be commenced within a reasonable time after the procuring of the release from the rules and regulations of the State Board of Health as hereinafter described and the said dam shall be completed within a reasonable time after the work thereon has been commenced.
“ 2nd. And it is expressly agreed between the parties hereto that failure of the party of the second part [Commissioners] to construct the dam in accordance with the terms of this agreement shall at the option of the party of the first part [Haverstraw] release both the parties hereto from any obligation whatsoever under this agreement ”.
In return for the Commissioners’ covenants, Haverstraw agreed that it would expend up to $15,000 for a filtration plant and that it would meet any other requirements of the Board of Health as a condition to the release of the restrictions on the use of Cedar Pond. Haverstraw further agreed that in the event the Commissioners took title to Cedar Pond upon the release of the restrictions then in effect and in the further event in the future should new restrictions be placed upon it, Haverstraw would 1 ‘ perform any act and take and adopt and carry out any other course and plan which shall or may be possible as an alternative thereto'for the protection of the water supply by it derived from the said Cedar Pond Brook, and the said Cedar Pond which may or shall render unnecessary the restriction of the use of the said watershed.” Finally, Haverstraw agreed to surrender and release to Rockland any of its rights under its lease with Rockland for Cedar Pond and the Cedar Pond Lot.
Pursuant to these agreements and on June 9,1915, Haverstraw released and surrendered its lease to Rockland and Rockland conveyed to the Commissioners the 664 acres known as the Cedar Pond Furnace Lot.
Prior to the closing and on the Commissioners’ application, on April 2, 1915, the New York State Board of Health amended its rules of 1910 so as to exempt from the restrictions Cedar Pond and the upper portions of Cedar Pond Brook.
In the Summer of 1914 the Commissioners had the area surveyed, determined from the contour of the land surrounding Big Cedar Pond and Little Cedar Pond the level to which the new lake should be raised and prepared plans for the new dam. *1020 By virtue of the Harriman and Cunningham conveyances and the contract with Rockland to purchase the Cedar Pond Furnace Lot the Commissioners had legal title or contract rights to all of the lands to be flooded by the erection and operation of the dam. It was constructed in the Fall of 1914 and completed in 1915 at the approximate location of the stone dam of Haverstraw. The dam is 510 feet in length with 2 spillways at elevation of 1,030 feet, the crest of the dam being at elevation of 1,033 feet. A headgate with a base elevation of 1,011 feet was placed in the dam. In 1924 the headgate was permanently blocked and subsequent thereto the only withdrawals of water below the spillways have been accomplished by siphons placed over the spillways.
It took a year or so after the dam was erected and the head-gate closed to form the new lake, known as Lake Tiorati. Since the erection of the dam there have been many occasions during the Summer and Fall months of the year when, due to low rainfall and the evaporation from the surface of the lake, the level of the lake has fallen below the spillways.
During these periods when water has not run over the spillways and when there have not been rains falling within the watershed, no water has run down Tiorati Brook. When there has been no water in the brook plaintiff, under various circumstances as hereinafter outlined, has withdrawn water from Lake Tiorati so that it might run down Tiorati Brook and be impounded in plaintiff’s reservoir at its Stony Point Plant.
The first evidence of any withdrawal of water from Lake Tiorati when the lake level was below the spillways was in the year 1927. There is no evidence of withdrawal or nonwithdrawal of water by or for the plaintiff prior to that year either by siphons placed over the spillways or by the opening of the headgate when it was operable prior to 1924. Although withdrawals of water were made by Haverstraw in and after the year 1927 by means of siphons, no record was kept of the use of the siphons until 1932. From then until 1941 Haverstraw’s monthly operating reports show the months in which siphons were in operation, being in each year except 1933 and being usually in August and September with some extremely dry years resulting in withdrawals as early as June and as late as October. The siphoning was accomplished during this period by Haverstraw’s employees transporting siphons from the Stony Point Station to the Lake Tiorati dam and then placing them in operation for such periods as they were needed. These siphons were simply constructed by means of a four-inch pipe with an elbow so that one end, the intake, would be immersed *1021 in the lake and the discharge end would be placed behind and below the crest of the spillways. Each siphon had a capacity of around 16,000 gallons per hour. At times several would be.in operation at once, depending on the need. Frequently they were in use for several days. There is no record of the amounts withdrawn until 1941. Thereafter the quantities withdrawn were measured.
There was no interference by the defendant with this operation until 1940. Although the siphoning was not done furtively, and it is difficult to believe that defendant’s employees did not witness the siphoning, there is no evidence that defendant had actual notice of the siphoning until 1940. This was the year Mr. A. K. Morgan became defendant’s general manager and chief engineer. He questioned plaintiff’s right to withdraw water from the lake and had the siphons removed. Plaintiff put them back in operation and defendant removed them again. Plaintiff threatened legal action against the defendant and arranged for a conference with defendant which was held on August 27, 1940. At this conference defendant asserted that plaintiff had no right to withdraw water from Lake Tiorati and plaintiff claimed this right by virtue of the 1914 agreement. The conference concluded by each side agreeing to review its rights and liabilities with the understanding that plaintiff could continue its withdrawals for that season (1940) and the defendant directed plaintiff to measure the amount of water withdrawn since a charge might be made for it. In confirming the results of the conference defendant wrote plaintiff that the withdrawal was permitted only for ‘1 the present emergency ’ ’, and that “ you will make arrangements to revise your plant so that it will be self-sufficient after this present emergency ’ ’. Plaintiff agreed to at once undertake surveys and studies for other storage facilities to “ make the use of water from Lake Tiorati unnecessary ”.
In July of 1941 the parties met again, each reasserting the positions taken the previous year. The only agreement at- that time seemed to be a dislike for litigation over the dispute. The plaintiff needed water badly and agreed to pay $20 per million gallons for water it might draw by siphons. The plaintiff again agreed to study other sources of water and it was understood that payments made would be without prejudice, i.e., that they would not be taken as an admission that plaintiff had no right to withdraw water. Although water was siphoned in 1940 after the initial meeting, defendant claims it did not know of it and. did not bill plaintiff for it. In March of 1942 plaintiff paid defendant $769.17 for water withdrawn in 1941 with a letter *1022 stating that the payment in no wise prejudiced its claim to the right to take water without payment.
Thereafter in 1943, 1944, 1946 and 1949. plaintiff withdrew water by siphon and paid invoices submitted by defendant. In 1949 the price was raised by the defendant to $30 per million gallons. This raise was made without notice to, consultation with or prior consent of the plaintiff. In 1954 there were further withdrawals and when plaintiff was advised the siphons might again be removed by defendant it called for another conference which was held on November 2, 1954. The parties for the third time expressed their respective positions, defendant claiming plaintiff had no rights, and plaintiff asserting its rights. It was agreed that plaintiff might continue to purchase water, provided it continue its study for other sources of supply or storage. Withdrawals subsequent to 1954 occurred in 1955,1957 and 1958.
Two years passed and in October of 1956 plaintiff wrote defendant and inquired if further discussions or negotiations might be had. The defendant thereupon referred the matter to the Attorney-General and the plaintiff had its counsel send a report to the Attorney-General in which the position of the plaintiff was explained. Nothing developed from these communications and in August of 1957 plaintiff made further inquiry of the defendant. This resulted in a final conference on September 27, 1957 in which it was agreed that certain records and engineering data would be furnished after which another conference would be held.
A further conference was not held. On February 2, 1958 defendant informed plaintiff that since it had been advised by the Attorney-General that plaintiff had no right to withdrawal of water, there was no basis for any adjustment or settlement. The plaintiff was again requested to provide its own facilities for an adequate water supply so that it would be no 'longer necessary to call upon the defendant.
Thereafter and on February 19, 1959 plaintiff commenced the action. Since the inception of the action withdrawals were made in 1959, 1962, 1963 and the court is advised by counsel for the parties that withdrawals were made in 1964 subsequent to the trial. All of these withdrawals were made at the increased rate of $30 per million gallons.
In addition to these facts found upon the actions of the parties to this litigation, considerable proof was offered as to characteristics of the watershed, the effect of rainfall within it, the water losses due to evaporation and evapotranspiration (the loss of water from swamp and lowlands adjoining a body of water *1023 resulting from evaporation from the soil and transpiration from the plant life the soil supports), and the annual cycle of water flowing over the Lake Tiorati spillways.
Annual evaporation loss is approximately two vertical feet per year and is directly proportional to the surface area of the body of water. According to plaintiff’s expert, Old Big Cedar Pond and Little Cedar Pond had annual evaporation losses of 65 million gallons and Lake Tiorati has an annual evaporation loss of 192 million gallons. Little Cedar Pond and Big Cedar Pond were surrounded by a large swamp area, much larger than that surrounding Lake Tiorati. There is therefore considerably less evapotranspiration loss today than there was when the old ponds were in existence. The court does not accept defendant’s expert’s opinion that the increased evaporation loss is more than offset by the lessening of evapotranspiration loss. The combined losses from both evaporation and evapotranspiration in Lake Tiorati today exceed the combined losses from these causes in 1914, but the combined loss is much less than the increased evaporation loss.
The annual cycle of rainfall and post-Winter thawing is such that each Spring an excess of water flows over the Lake Tiorati spillways. Over extended periods, at least a year, the yield from Lake Tiorati is lessened only slightly and that by the net loss from evaporation and evapotranspiration. During shorter periods in the Summer and Pall months, however, the dam does affect the yield adversely. When the level of the lake falls below the spillways due to evaporation and reduced precipitation, rainfall, unless it be in considerable amounts, which would otherwise flow down Tiorati Brook is held behind the dam. Thus, by reason of the dam during less than year periods, water at times is prevented from flowing down Tiorati Brook.
The watershed of Lake Tiorati is 1.37 square miles, the watershed of Tiorati Brook, including the lake, is 15.7 square miles. The average daily yield of the watershed is 1.07 million gallons per square mile resulting in a yield to the Lake Tiorati watershed of 1.5 million gallons per day and a yield to the Tiorati Brook watershed of 17 million gallons'per day.
With this statement of the facts as found by the court we now pass to the issues that are presented.
The plaintiff in its second amended complaint claims that prior to the making of the 1914 agreement it was in possession of and had the use of the lands under Cedar Pond and Little Cedar Pond, the waters thereof, the unobstructed outflow of waters therefrom and the right to draw upon said waters in such quantities as was necessary for the operation of its Haver *1024 straw Plant. It further asserts that in substitution of these pre-1914 agreement rights, new rights in the nature of corporeal hereditaments constituting real property and an estate and interest in real property were given Haverstraw resulting from the Commissioners’ agreement “ to enlarge the storage basin of Cedar Pond whereby a better and increased supply of water will be insured to Haverstraw * * *; to enlarge the storage basin of Cedar Pond by erecting a proper dam which will raise the height of the said Cedar Pond at least four feet above its present level * * *; to do nothing which will interfere [sic] or lessen the natural flow of water into and out of the said pond * * * and; not to divert any of the waters flowing into or out of the said pond.” It is further alleged that by virtue of the 1914 agreement plaintiff became vested with prior and superior rights to the use and possession of the enlarged storage capacity created by the new dam as well as the use and possession of the natural flow of the waters of Lake Tiorati to the extent, in the manner, at the times and in the quantities that may then or in the future be required .by plaintiff without interference by the defendant and that plaintiff and Haverstraw have been and are in continuous and uninterrupted possession thereof. Plaintiff further claims that since the construction of the dam it has withdrawn by gate or by siphons water held back by the dam whenever needed to supply its Stony Point .Station without interference or interruption by defendantthat defendant unjustly claims or may claim an estate or interest in the real estate adverse to that of plaintiff, and that any estate or interest claimed by defendant is invalid and ineffectual in that said estate or interest is subordinate, subject and inferior to the superior right of the plaintiff. The relief sought is a declaration of the respective rights of the parties, that plaintiff’s claim to the use and possession of the enlarged storage capacity created by the new dam as well as the natural flow without interference by the defendant be determined to be' superior and prior to the rights of the defendant, that the defendant be barred from all claims to an estate or interest in the property adjudged to be the property of the plaintiff and that the plaintiff’s possession of the waters be confirmed in the plaintiff.
The defendant, in addition to denying the material allegations of the complaint, interposed five separate defenses. First, the defendant asserts the bar of the Statute of. Limitations alleging that for more than 15 years prior to the commencement of the action plaintiff asserted the same claims made in the action during which time defendant denied those claims and during which time plaintiff did not possess, use or enjoy the real property *1025 wiiich. is the subject of the action except by purchase from the defendant and that for more than 15 years prior to the commencement of the action the only waters enjoyed or used by the plaintiff have been the natural overflow and no waters impounded by the dam have been drawn by the plaintiff except by purchase. Second, defendant asserts that for more than 15 years prior to the action it has exclusively, continuously, openly, notoriously and under a claim of right, hostile and adverse to plaintiff, possessed and used the real property which is the subject of the action being all of the stored and impounded waters in Lake Tiorati. Third, the defense of the Statute of Frauds is raised in that the writing relied on by the plaintiff does not grant to plaintiff the interest in real property claimed by it. The fourth and fifth defenses, ultra vires, assert that defendant had no authority to acquire the land except for public park purposes and if the agreement in fact gave to the plaintiff the right it claims the agreement was beyond the authority of the defendant to make.
An analysis of the agreements entered into between Rockland and the Commissioners and Haverstraw and the Commissioners in 1914, the performance thereunder and the circumstances of the parties at the time is sufficient to determine the rights of the plaintiff herein. The plaintiff has not established that the 1914 agreement gave it the superior rights which it claims to draw the waters stored or impounded by the dam and the affirmative defenses asserted by the defendant, thus, need not be considered. Defendant’s motion made during the trial to amend its answer to interpose two additional defenses, upon which the court reserved decision, is denied.
We must examine all the circumstances that existed at the time the agreements were enterd into in order to determine the intention of the parties and interpret the covenants made and the rights and liabilities therein created (Aron v. Gillman, 309 N. Y. 157; Becker v. Frasse & Co., 255 N. Y. 10; Duttweiler v. Jacobs, 223 App. Div. 292).
There is nothing before the court to indicate the number of customers Haverstraw had in 1914 and the extent of its then water needs. Since Haverstraw and Rockland were closely related corporations, both controlled by the Driscoll family, we must look to the advantages flowing to both from their contracts with the Commissioners. The lease between Haverstraw and Rockland was never produced and its terms are unknown except for the recitals in other documents that it would expire in 1917. Plaintiff argues that because of the control exercised by Driscoll over both corporations it can be inferred that the lease was *1026 renewable indefinitely. However it may be as easily inferred that Driscoll in order to procure a contract favorable to Rock-land was willing to terminate or greatly limit Haverstraw’s rights as a lessee of the 'Cedar Pond Lot. Although plaintiff asserts that Haverstraw did in fact erect a dam at or near the site of the present dam and claims water was impounded thereby, the court has found, as previously indicated, that no such dam was ever in operation. Furthermore, since Rockland did not have title to all of the lands lying under the original Cedar Pond, that it owned none of the land lying under Little Cedar Pond and that it did not own much of the land that would have been inundated by the impounding of waters by the dam Haverstraw claimed it constructed, Haverstraw did not have the right to enlarge the old ponds by raising them to the level of the dam it claims to have constructed. Much more land was inundated by the Commissioners’ dam than that which would have been inundated by Haverstraw’s dam. Haverstraw’s dam would have created a body of water of 180 acres, the Commissioners’ dam which raised Cedar Pond about 17 feet created Lake Tiorati with an area of 288 acres. Haverstraw as lessee of Rockland prior to the 1914 agreement had no rights in the bed of Little Cedar Pond, had rights in only a portion of Cedar Pond and had no rights to impound water which would raise the level of Cedar Pond.
Rockland in 1907 purchased the Cedar Pond Furnace Lot for $10,000. It was this same parcel that it contracted to sell to the Commissioners in 1914 for $45,000. The only condition to this contract was the removal or release of the restrictions of the State Board of Health which were inconsistent with the uses intended by the Commissioners and Rockland undertook to have its affiliate Haverstraw execute any documents and perform any acts necessary to effect the release of any restrictions from the lands to be conveyed. Although this contract must be read and interpreted in the light of the simultaneous contract between Haverstraw and the Commissioners, it is not conditioned in any way upon the performance of this latter contract and insured the sale by Rockland to the Commisisoners subject only to the release of restrictions.
The agreement between Haverstraw and the Commissioners does recite Haverstraw’s use of Cedar Pond and Cedar Pond Brook as a source of water supply and the intention of the Commissioners to enlarge the storage basin of Cedar Pond whereby a better and increased supply of water will be insured to Haverstraw. Recitals in a contract, unless they are intended to embody a contractual right or obligation, may be contradicted *1027 (Hutchinson v. Ross, 262 N. Y. 381). Where both the recitals and the operative clauses are clear, though inconsistent with each other, the operative part must control since it is the most important (Williams v. Barkley, 165 N. Y. 48). The covenants on their face are clear and, in the light of the circumstances that existed at the time they were made, determine and fix the rights of the parties.
The 'Commissioners agreed to enlarge the storage basin of Cedar Pond by erecting a dam which would raise the height of Cedar Pond at least four feet above its present level. No limitation was placed upon the height of the dam and there is no evidence that Haverstraw ever objected to the height of the dam. The Commissioners had the power to erect a dam which would inundate a large area of land since by other conveyances they had acquired lands adjacent to those being acquired from Rockland. The fact that the instrument referred to the height of the new dam with relation to the “ present level ” of Cedar Pond shows clearly that at that time Cedar Pond remained in its original state as a distinct and separate body of water. The Commissioners further agreed after the dam was completed to do nothing ‘1 which would interfere [sic] or lessen the natural flow of water into and out of the said pond ”. This means just what it says. The prohibition against interfering with or lessening the natural flow into and out of said pond appears after the covenant to enlarge the storage basin of Cedar Pond by the erection of a dam and can only refer to interfering with or lessening the natural flow after the dam has been erected. It is plaintiff’s contention that this gives plaintiff the right to withdraw waters at will whenever its need arises irrespective of the extent of the need. Plaintiff’s contention is not supported by the language of the contract. The court cannot make a new contract for the parties under the guise of interpreting the writing (Friedman v. Handelman, 300 N. Y. 188; Brown v. Manufacturers Trust Co., 278 N. Y. 317; Graf v. Hope Bldg. Corp., 254 N. Y. 1; Heller v. Pope, 250 N. Y. 132). Contracts must be enforced as they are written (Anthony v. Syracuse Univ., 224 App. Div. 487).
The Commissioners, in addition to agreeing not to interfere with or lessen the natural flow into or out of said pond, agreed not to divert any of the waters flowing in or out of the pond and further agreed that the dam upon its erection would be maintained by it. In return for these covenants from the Commissioners, Haverstraw agreed to release its lease, to give necessary consents for the removal of the restrictions imposed by the State Board of Health and agreed, if required, to build a filtration *1028 plant, with the understanding that the cost thereof would not exceed $15,000. The filtration plant was actually built at a cost of around $7,500.
Haverstraw, as a lower riparian owner, had a right to the use of the water flowing over the dam subject to reasonable uses by upstream owners. By the 1914 agreement the Commissioners agreed to no use or diversion of water impounded by the dam. Other benefits accrued to Haverstraw from the agreement. The dam by flooding the original shallow ponds to a considerable depth did improve the quality of the water.
In this light, the plaintiff cannot assert it has the unlimited right to withdraw waters impounded by the dam and not running over the spillways. Its interpretation of the 1914 agreement would give to Boeldand and Haverstraw far greater rights than they had before 1914. In addition to these claimed greater rights there was received by Boeldand a cash consideration greatly in excess of what it had paid for the property but a few years before.
Plaintiff’s charge that by reason of the dam and evaporation and light Summer precipitation, periods occur when no water flows down Cedar Pond Brook is well founded. However, appreciable rainfalls in the Summer, in the absence of the dam, would raise the brook for but a few days and plaintiff’s limited storage facilities at its Stony Point Station would be inadequate to hold much of this increased flow. These periods of lessened flow or interruption of flow in Tiorati Brook were either not anticipated by Haverstraw or, if anticipated, not provided for in the agreement. Thus, the silence of the agreement as to this condition occurred either by Haverstraw not anticipating the situation or by accepting the situation because of the other advantages that accrued to it and its affiliate Boeldand.
If this situation was contemplated by the parties and if demand for protection against this condition was made by Haverstraw it is certainly reasonable to assume that in the negotiations the demand was rejected by the Commissioners. Their purpose in acquiring the property for park and recreation purposes was clear. The purchase was conditioned upon a release of the State Department of Health restrictions to permit boating, bathing, fishing and other recreational pursuits. The court cannot accept an interpretation which would mean that the Commissioners acquired this property for this express purpose, insured the removal of restrictions as to its intended uses, erected the large dam at considerable expense, and then permitted plaintiff to have an unlimited right to withdraw waters at any times and to any depths to satisfy its needs in furnishing *1029 water to the customers it then had or any it might have in the future.
The plaintiff maintains that the practical construction given the 1914 agreement by the parties in the early years following the making of the agreement must be given great weight in determining the meaning and intention of the parties as expressed in the agreement. In order to establish a practical construction by acts there must be conduct by one party expressly or inferentially claiming as a right under a doubtful provision, coupled with knowledge thereof and acquiescence therein, expressed or implied by the other party (Niagara Falls Int. Bridge Co. v. Grand Trunk Ry. Co., 212 App. Div. 705, mod. on other grounds 241 N. Y. 85; Gracie Sq. Realty Corp. v. Choice Realty Corp., 305 N. Y. 271).
The conduct of the parties falls far short of affording the practical construction claimed by the plaintiff. There is no evidence of any withdrawals of water made by plaintiff until 1927. From then until 1940 there is no question of withdrawals by the plaintiff but there is no evidence during this period that such withdrawals were made under a claim of right and that defendant knowingly consented to the withdrawals. No practical construction can be found after 1940 when the defendant clearly denied plaintiff’s claims which were then, so far as the record shows, first clearly asserted.
It is thus determined that plaintiff does not have the superior and prior rights which it claims to withdraw water from Lake Tiorati when the level of the water is below the spillway.
The foregoing opinion shall constitute the decision of the court in accordance with CPLB 4213 (subd. [b]).
Settle judgment on notice in accordance with the foregoing, with costs and disbursements to the defendant, at which time the court will consider a stay and the furnishing of water to the plaintiff under the present arrangement for a reasonable time.