In the Matter of the Arbitration between GLOBE TRANSPORT & TRADING (U.K.) LTD., as Owner of the Globe Nova, Petitioner,

and

GUTHRIE LATEX, INC., Respondent.

No. 88 CIV 9128 (KC).

United States District Court, S.D. New York.

Sept. 22, 1989.

Scott A. Walker, Walker & Corsa, New York City, for petitioner.

Frank Marcigliano, New York City, for respondent.

## OPINION AND ORDER

CONBOY, District Judge:

This case arises out of a dispute over the actions of an arbitrator in an arbitration proceeding which are alleged to form the basis for vacating an arbitration award as outlined in the Federal Arbitration Act, codified in Title 9 of the United States Code, section 1 *et seq.* A tripartite arbitration panel awarded Guthrie Latex Inc. ("Guthrie") $911,691.86 in a proceeding stemming from the contamination of a liquid latex shipment allegedly caused by the negligent acts of the transport tanker operator, Globe Transport & Trading (U.K.) Ltd. ("Globe"). Globe has petitioned the Court to vacate the arbitrators' award and Guthrie has cross-petitioned to confirm.

## BACKGROUND

Globe, a U.K. corporation, operates parcel tankers in worldwide trade. Guthrie, a U.S. corporation, imports and sells natural latex. On May 19, 1982, the parties entered into a written contract to charter a vessel for the transport of liquid latex. An arbitration clause was included in the contract. The arbitration clause agreed upon states, in relevant part, that:

Any dispute arising from the making, performance or termination of this charter party shall be settled in New York, Owner and Charterer each appointing an arbitrator, who shall be a merchant, broker or individual experienced in the shipping business; the two thus chosen, if they cannot agree, shall nominate a third arbitrator who shall be an admiralty lawyer.

Globe's Petition to Vacate Arbitration Award, Exhibit A, ¶ 5. Guthrie loaded 1,632.246 metric tons of liquid latex onto the Globe ship to be transported from Malaysia to the United States. Upon arrival in the U.S. inspectors found that 1,333 tons (stored in tank 2C) were contaminated, allegedly because of contact with the mild steel from which the tank was constructed. The U.S. consignees rejected the cargo. The damaged latex was eventually sold as salvage. Final Award ("FA") at 4. Guthrie initiated arbitration proceedings on March 31, 1984, wherein it was alleged that it sustained Cost and Freight loss of $567,-856.98 and expenses of $51,647.10, and sought these amounts plus interest.

Guthrie appointed Mr. Jack Berg and Globe appointed Mr. Ole Skarrup (later replaced by Mr. Manfred Arnold) as arbitrators. Berg and Skarrup nominated Mr. Lawrence Mahoney, Esq. as the third member, and chairman of the panel. The transcript of the first meeting of the arbitration panel, held on May 12, 1986, documents a discussion among the arbitrators and counsel for both sides, centered on what one called the "obscure wording" quoted above in the arbitration provision. The text of this colloquy is reproduced below, in relevant part:

Mr. Berg: . . . It appears that if one reads the clause in one manner, that only two arbitrators should hear the question and only if after they disagree on a decision should a third arbitrator be brought into the picture.

It is my understanding that counsel agree that we have a tripartite panel from the start and this is what we have done, is that correct?

Mr. Walker [for Globe]: Yes.

Mr. Marcigliano [for Guthrie]: Yes, certainly we have done that, we agree.

Chairman [Mr. Mahoney]: It is the intention that it will be a two out of three decision.

Mr. Walker: Or a unanimous one.

Mr. Marcigliano: Or a unanimous one. The charter party seemed to read that the panel chairman would make the decision in the event of a split opinion.

Mr. Walker: This is the point that Mr. Berg is wanting this qualification of.

Chairman: What I understand this clause to mean, is that if the arbitrators, the two arbitrators selected by the parties did not agree, they would at that time select a third man. It would proceed from that point and in a normal fashion, in accordance with American procedures. I don't interpret that to mean that the chairman would have the prerogative.

Mr. Marcigliano: Okay.

Mr. Walker: In any case, that is not the question.

Mr. Arnold: It would seem to be impractical and it doesn't make sense not to use one of the arbitrators.

Mr. Marcigliano: My idea is that two out of three is acceptable to me. If two of you gentlemen agree with either of our positions, that is perfectly acceptable.

Mr. Arnold: I don't think—as long as we have three panel members, then a decision by a majority will carry the day at the end.

Mr. Walker: It is either going to be unanimous or it is going to be a majority.

Mr. Berg: Right.

Mr. Arnold: Chairmen have been known to dissent.

The Chairman: It is agreed.

Affidavit of Frank M. Marcigliano, sworn to January 23, 1989, Exhibit F, Transcript ("Tr.") of May 12, 1986 Arbitration Proceeding at 88–90.

In the arbitration, Guthrie attempted to establish its case of iron contamination of the latex by demonstrating that the latex was delivered to the ship in good condition, but arrived at the destination in a damaged state, its iron content five to ten times higher than the level noted at loading. Guthrie asserted that the Heveamul wax coating applied to the tank, at its insistence, would normally have protected the cargo from contact with the mild steel surface. However, because Globe had loaded hot lube oil in an adjacent tank and had subjected another adjacent tank to heat from hot water butterworthing (treating the tank with hot steam to raise the temperature for storage of the oil shipment), the wax coating failed. FA at 6.

Globe argued that the discoloration of the latex was not caused by iron contamination but by "a dark particulate matter" in the product. Globe contended that any iron contamination existed prior to the loading of cargo on the vessel. Globe further argued that it utilized the wax coating under express instruction and inspection by Guthrie but that the wax manufacturer did not recommend the Heveamul as a tank coating (because of the fact that the product is water soluble and, therefore, likely to be soluble in latex). Guthrie claims that the wax coating failed, not because of the heating of adjacent tanks, but because of the solubility of the wax coating.

The arbitrators secured the services of New York Testing Laboratories (NYTL) to gain an expert opinion on the issue of solubility of the Heveamul coating. FA at 10. The laboratory concluded that although the wax is soluble in water, the wax remained in place when immersed in liquid latex. *Id.* Therefore, the laboratory recommended that Heveamul is effective in protecting liquid latex from contamination. *Id.*

On July 17, 1987, prior to the close of the evidence, counsel for Globe learned that Mr. Carmen Russo of Vincent, Berg, Russo, Marcigliano, & Zawacki, the firm that was counsel of record for Guthrie, joined the firm of Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, from which Mr. Mahoney had retired as partner in June of 1985 and taken the title "of counsel." Counsel for Globe wrote to Mahoney regarding the propriety of his continued participation on the arbitration panel, citing the possibility that his firm could reap economic benefits from the outcome of arbitration. Mr. Mahoney replied some six months later on January 19, 1988, and advised that he would not withdraw from the panel as his financial relationship with his firm would not be affected by the instant case. Globe's Petition to Vacate Award, Exhibit C; *see also* Affidavit of Vincent J. Barra, sworn to January 23, 1989, ¶¶ 7–12. He also stated that he would continue to participate as panel chairman.

Based upon the NYTL report and other testimony, on November 14, 1988, the panel unanimously found for Guthrie in the amount of $911,691.86. FA at 10–11. The panel concluded that Guthrie had demonstrated that the damage to the latex was not caused by the use of an unsuitable protective tank coating and that Globe had failed to establish an effective defense to the prima facie case presented by Guthrie.

In its petition to vacate, Globe alleges that the panel ignored unfavorable evidence of the performance of the Heveamul under conditions of agitation, relying instead on evidence of the performance of the wax under static conditions in the determining of the suitability of the product for use on an ocean-going vessel. Globe also argues that the continued participation of Mahoney in the arbitration process led to an unfavorable outcome, caused by Mr. Mahoney's alleged partiality. Guthrie has cross-petitioned the Court to confirm the award, claiming that Globe has not met its burden of establishing any ground for vacating the award. The burden of proof rests squarely on Globe as the party attempting to vacate the award. *Transit Casualty Co. v. Trenwick Reinsurance Co., Ltd.*, 659 F.Supp. 1346, 1351 (S.D.N.Y. 1987), *aff'd mem.*, 841 F.2d 1117 (2d Cir. 1988).

In essence, then, Globe's petition to vacate the award raises four issues: (a) whether the parties effectively modified the terms of the arbitration clause by their actions and words; (b) whether the arbitration panel was empowered to make judgments regarding the scope of its authority; (c) whether Mr. Mahoney should have disqualified himself because of possible partiality due to his relationship with legal counsel; and (d) whether the decision of the panel was "irrational."

## LEGAL ANALYSIS

The Federal Arbitration Act, 9 U.S.C. § 10 (1982), provides several very narrow grounds for vacating an arbitration award. Section 10 provides that a court may vacate an award only in such situations as

(a) [w]here the award was procured by corruption, fraud, or undue means;

(b) [w]here there was evident partiality or corruption in the arbitrators ...;

(c) [w]here the arbitrators were guilty of [specific types of] misconduct ...; or

(d) [w]here the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award ... was not made.

9 U.S.C. § 10 (1982). The arbitration award may also be vacated if the court finds the arbitrators guilty of "manifest disregard" of the law. *Drayer v. Krasner*, 572 F.2d 348, 352 (2d Cir.), *cert. denied*, 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791 (1978); *Sperry International Trade v. Government of Israel*, 689 F.2d 301, 305 (2d Cir., 1982). As the instant case involves a consideration of whether the actions of the arbitrators, and Chairman Mahoney in particular, form a basis for vacating the award, only sections 10(d) and 10(b) are relevant here.

■ Taking the last issue, as enumerated above, first, we recognize that the Supreme Court has clearly opined that the courts are not authorized to review the merits of an award even where the parties allege that the award rests on errors of fact or misinterpretations of the contract. *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987). There is a strong federal policy to resolve disputes by arbitration which would be undermined if the courts had final say on the merits of an arbitrator's award. *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). If the courts could intervene on the merits of the award, the speedy, and less expensive, resolution of grievances by arbitration would be frustrated. *Misco*, 108 S.Ct. at 371. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Id.; see also Brady v. Form–Eze Systems, Inc.*, 623 F.2d 261, 264 (2d

Cir.1980) ("it is well established that arbitrators are not required to disclose the basis upon which their awards are made ... we are bound by the interpretation of the instrument so long as it is barely colorable."), *cert. denied*, 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980). Because we believe, in light of these authorities, that Globe has not met its burden on its claim of "irrationality," we deny that part of its petition to vacate.

■ As to the issue of whether the parties effectively modified the terms of the arbitration clause by their actions and words, we note that we were unable to locate any cases which specifically involve the modification of an arbitration provision of a contract. However, because such a provision is part of a commercial contract, and indeed parties may only be compelled to submit their dispute to arbitration where there is an agreement to arbitrate, *see Brener v. Becker Paribas Inc., A.G.*, 628 F.Supp. 442, 446 (S.D.N.Y.1985), it is certainly proper to look to the rules governing the modification of contracts.

It is a fundamental contract principle that a contract provision may be modified by the actions or expressions of the parties. *See, E.g., Fox v. Merrill Lynch & Co., Inc.*, 453 F.Supp. 561, 564 (S.D.N.Y.1978). The practical construction or interpretation of a contract by the parties is an important indication of the intent of the parties and courts give great weight to such interpretations. S. Williston, *A Treatise on the Law of Contracts* § 623 (3d ed. 1961). "Few things can better evidence the meaning of a contract than the actions of the parties themselves." *Ottley v. Palm Tree Nursing Home*, 493 F.Supp. 910, 914 (S.D.N.Y. 1980).

In the case of *Dow Chemical Co. v. S.S. Giovanella D'Amico*, an action to recover for loss arising from damage to cargo, the court stated that

> where there is doubt or ambiguity as to the meaning of a contract the conduct of the parties in rendering or receiving performance under it—that is, the interpretation which they themselves place upon

the contract will be given considerable weight by the courts.

*Dow Chemical Co. v. S.S. Giovanella D'Amico*, 297 F.Supp. 699, 706 (S.D.N.Y. 1969) (citing *Warner–Lambert Pharm. Co. v. John J. Reynolds, Inc.*, 178 F.Supp. 655, 667 (S.D.N.Y.1959), *aff'd*, 280 F.2d 197 (2d Cir.1960); and, Williston, *supra*, at 789–790). *See also Insurance Co. v. Dutcher*, 95 U.S. 269, 273, 24 L.Ed. 410 (1877) ("There is no surer way to find out what parties mean to say than to see what they have done ..."); *Croce v. Kurnit*, 737 F.2d 229, 235 (2d Cir.1984) ("It is the practical construction of the contract prior to the commencement of litigation that is compelling.").

This "practical construction" of a contract provision must be shown by conduct of one party which expressly or inferentially establishes a modification which is expressly or inferentially accepted by the other party. *Portsmouth Baseball Corp. v. Frick*, 278 F.2d 395, 401 (2d Cir.1960) (citing *Niagara Falls International Bridge Co. v. Grand Trunk Railway Co. of Canada*, 212 A.D. 705, 710, 209 N.Y.S. 79 (4th Dep't), *modified on other grounds*, 241 N.Y. 85, 148 N.E. 797 (1925); 3 Corbin, *Contracts* § 558 at 144 (1951)).

The transcript of the first arbitration proceeding (Guthrie's Petition to Confirm, Exhibit F) reveals that not only was Mr. Mahoney present, acting as chairman, but that he participated in examining the witness and directed the proceeding. Counsel for both Globe and Guthrie fully cooperated during the session and never once raised any objection to Mr. Mahoney's interactive behavior.

We acknowledge that the discussion regarding the "obscure wording" of the arbitration provision was raised on the record for the first time by Mr. Berg, one of the arbitrators. However, the transcript indicates that an "off the record" discussion was had on this topic before Mr. Berg broached it on the record. There is no way we can discern who brought up the subject in the first instance. Mr. Berg stated that the arbitrators intended to, and had in fact in that very meeting, acted as a tripartite

panel. We believe that the correct interpretation of the discussion that ensued is that counsel for both parties agreed to this procedure and further agreed that *any* two of the arbitrators could constitute a majority for voting purposes. *See* Tr. at 88–90 (especially the statement by Mr. Arnold that "Chairmen have been known to dissent."). Globe's counsel failed to state at that time that Mr. Mahoney was only to participate in the event of a split-opinion by the other arbitrators. Rather, both parties, by their express words and actions consented to Mr. Mahoney's role as chairman with an active voice in proceedings and a vote equal to that of the other arbitrators, and, thus, modified the arbitration provision. *See Fox v. Merrill Lynch & Co., Inc.,* 453 F.Supp. 561, 564 (S.D.N.Y.1978) ("Parties may modify their contractual obligations by an agreement reasonably to be understood from their conduct.").

This practical interpretation of their agreement to arbitrate, that all counsel extended the scope of the arbitrators' authority, granting Mr. Mahoney equal authority as had the other panel members, dispels Globe's claim that the arbitrators exceeded their authority. Accordingly, to the extent that Globe's motion to vacate is predicated upon a lack of agreement as to the authority of the third arbitrator, the motion is denied.

█ Although there is some authority to the effect that a decision by an arbitrator as to the scope of the authority conferred upon him is not binding upon the Court, and thus, subject to judicial review, *see Mutual Benefit Health & Acc. Ass'n v. United Casualty Co.,* 142 F.2d 390 (1st Cir.), *cert. denied,* 323 U.S. 729, 65 S.Ct. 65, 89 L.Ed. 585 (1944) (plaintiff claimed that arbitrator failed to follow the terms of the submission, circuit court affirmed district court's dismissal of complaint yet stated in dicta that "ordinarily a decision by an arbitrator as to the scope of the authority conferred upon him by the submission is not binding."); *Marceron v. Chevy Chase Services, Inc.,* 258 F.2d 155 (D.C.Cir.1958) (in case involving dispute over appraiser's interpretation of tracts of land to be appraised in rental agreement between landlord and tenant, court stated that "[a]rbitrators do not bind principals of contracting parties when they go beyond the authority delegated to them"), these cases do not prevent the parties, by consent, from conferring additional authority on the arbitrators. Arbitrators powers are defined by contract, and as the quoted excerpts from the transcript demonstrate, there was a written contract that was subsequently modified by the parties both orally and by their conduct.[1] To reiterate, we view the instant action as one where the parties themselves, who after discussing the scope of the arbitrators' authority with the panel, modified the arbitration clause to give the third arbitrator more power than that granted in the clause, namely the right to listen to the evidence from the start, thus, before a dispute between the two appointed arbitrators arose, and the right to vote even if there was no deadlock between the two other arbitrators. We thus reject Globe's view that the arbitration panel alone erroneously interpreted the scope of its authority and in fact exceeded the authority given to it.

Even if it could be said that the panel itself interpreted the scope of its authority,

---

1. We note that counsel for Guthrie had a different recollection of the modification of the arbitration agreement; to wit, that the third arbitrator would be appointed and hear all of the evidence but that he would not have any input in the decision making process unless the two other arbitrators disagreed. See Petition of Globe to Vacate Award, Exhibit B. This recollection, which itself implicitly recognizes that the parties can modify their agreement, made more than one year after the oral modification, does not control here, rather the contemporaneous words and actions do. Furthermore, we disagree with counsel for Globe's assertion that this recollection, as memorialized, and the subsequent reply thereto by Mr. Mahoney "make[ ] no sense" if the clause was modified as Guthrie suggests, and we accept. The reply by Mr. Mahoney, while perhaps inartfully drafted, does not indicate that the idea that all three arbitrators would hear and decide the case as a new one which was suddenly foisted on the parties. *See id.* Rather, it is Globe's argument as to what counsel actually meant by a unanimous vote or a vote of any two of the three arbitrators, with chairmen being known to dissent, that "makes no sense."

this case is different from *Pitta v. Hotel Ass'n of New York City, Inc.*, 806 F.2d 419 (2d Cir.1986), a case our research revealed but which was not cited by Globe in any of its memoranda of law. *Pitta* concerned an arbitrator who was dismissed by one of the parties to the arbitration. The other party objected to his dismissal and attempted to arbitrate the question of whether he had been validly dismissed. To answer this inquiry, the arbitrator was essentially required to examine the terms of his own contract of employment. The arbitrator concluded that he could only be validly dismissed by a joint action of both parties, and found for the side opposing his dismissal. Upon a petition to confirm the award, and a cross-petition to dismiss the award, the district judge vacated and Court of Appeals affirmed. Because of the arbitrator's obvious interest in the outcome of the arbitration, *Pitta* is distinguishable from the instant case. Here, Globe agrees that it had modified the arbitration agreement to the extent that the third arbitrator would be present at the presentation of all of the evidence, see footnote 1, *supra*, hence, the third arbitrator's job was not in jeopardy as was the arbitrator's in *Pitta*.

Furthermore, *Western Canada Steamship Co. v. Cia. de Nav. San Leonardo*, 105 F.Supp. 452, 453 (S.D.N.Y.1952), the case relied upon by Globe in large part, can also be differentiated from the instant case. There, the agreement in the charter-party provided that three arbitrators be appointed and that a majority vote would prevail. In fact, only two arbitrators were appointed by the parties and those two arbitrators failed to appoint the third arbitrator as set out in the agreement "because they found no substantial dispute as to the merits of the controversies." *Id.* The court vacated the arbitration award, find-ing that the arbitrators had exceeded their powers by failing to follow the rules for appointing the panel. *Id.* The *Western Canada* court stated that "unless all the arbitrators are appointed and act pursuant to the agreement, absent proof of waiver by the objecting party, the decision of the some of them cannot bind the parties." *Id.* The facts of *Western Canada* are distinguishable from those of the instant case, as it was an omission rather than an addition of a panelist that was at issue there. Also, in that case the parties were never informed about, nor did they consent to, the nonappointment of the third arbitrator. Here, not only were the parties informed about the change in the arbitration clause, they themselves made the change both by their words and by their conduct, endowing Mr. Mahoney with the full rights of the other arbitrators, that is the right to participate in the proceedings from the commencement and the right to vote whether or not there was a deadlock.[2]

Last, we reach the issue of whether Mr. Mahoney should have disqualified himself from the panel because of possible partiality due to his relationship with counsel for Guthrie. As stated above, the Federal Arbitration Act provides that a court may vacate an arbitration award "where there [is] evident partiality ..." by arbitrators. 9 U.S.C. § 10(b). The "evident partiality" standard requires "more than just the appearance of bias." *Local 814 Int'l Brotherhood of Teamsters v. J & B Systems Installers & Moving, Inc.*, 878 F.2d 38, 40 (2d Cir.1989). The Second Circuit has determined that although proof of actual bias is not required, "evident partiality" may be found to exist " 'where a reasonable person would have to conclude that an arbitrator was partial to one party.' " *id.* (quoting *Morelite Constr. Corp. v. New*

---

**2.** We also reject Globe's contention that the fact that Mr. Mahoney was given the right to vote necessarily meant that "the dispute would be resolved at the very outset by an admiralty lawyer." Globe's Memorandum of Law in Support of its Petition to Vacate at 7. The arbitrators selected by the parties were extremely experienced in the resolution of disputes by arbitration. For example, we note that the arbitrator first selected by Globe, Mr. Ole Skarrup, was one of the arbitrators mentioned in the *Western Canada* case, see 105 F.Supp. at 453, and that Messrs. Berg and Arnold were the arbitrators in the *Andros Compania* case, see 579 F.2d at 693. These arbitrators have made decisions without the assistance of attorneys on their panels in the past and there is no reason to assume that they would not take an active role in the decision making process simply because of the addition of a lawyer to the panel.

*York City Dist. Council Carpenters Benefit Funds,* 748 F.2d 79, 84 (2d Cir.1984)). In its papers, Globe has cited *Morelite* as the partiality standard, yet it posits the question of partiality as follows:

> [t]he law mandates that the court ask itself ... would not a reasonable person have to conclude that an arbitrator was partial if he were one of the founders of the law firm which had recently merged with the attorneys of record of one of the parties?

Globe's Reply Memorandum of Law at 5–6.[3] *Morelite,* however, did not concern the relationship between arbitrator and law firm, as is suggested by Globe in the above-quoted material. Rather, the case dealt with the alleged partiality of an arbitrator who was the son of an officer of the party in whose favor the award was rendered. In that situation, the Second Circuit held that without any facts as to the closeness of the relationship between the son and the father, it was necessary to vacate the award as it was constrained to assume that sons are more biased in favor of their fathers. *Morelite,* 748 F.2d at 84. The clear implication was that such a result need not obtain in all cases involving family members where facts as to the relationship were specifically detailed and provided to the court. *See also J & B Systems,* 878 F.2d at 40–41 (holding that father-son relationship might be sufficient to show "appearance of bias" but falls short of *Morelite*'s "reasonable person" standard).

■ The standards for disqualification of arbitrators are less stringent than those for federal judges. *Morelite,* 748 F.2d at 83 (citing *Merit Ins. Co. v. Leatherby Ins. Co.,* 714 F.2d 673 (7th Cir.), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983)). The arbitrator is responsible for disqualifying himself if he believes he may be partial to one party. *Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 174 (2d Cir.1984). The decision is usually one for the arbitrator. *Id.* at 174; *see also Andros Compania Maritima v. Marc Rich & Co.,* 579 F.2d 691, 698 (2d Cir.1978) (we note that

arbitrators Berg and Arnold were the arbitrators in this case; Mr. Arnold's relationship with one of the principals of company in whose favor the panel subsequently decided the dispute was in issue). However, failure by an arbitrator to disclose suspect relationships is grounds to vacate an award. *See Andros Compania,* at 698–699. The court in *Andros Compania* refused to vacate an arbitration award when the relationship in dispute was a friendship between one of the arbitrators (Mr. Arnold) and the president of the broker of the company acting as managing agent for the prevailing party (Mr. Nelson). The two men had been involved in nineteen arbitrations together, seventeen of which were decided unanimously, and in each case, Mr. Arnold had cast his vote in favor of the party which Mr. Nelson represented. The court found that although the two shared a professional relationship, they had no "business relationship", nor did their employers. The Second Circuit cited Justice White's concurring opinion in *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968), when it stated that "arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial." *Andros Compania, supra,* at 698. As there was no "direct financial stake in the outcome of arbitration" *Andros Compania, supra,* at 701, the relationship was too attenuated to require vacating the award.

In the instant case, the relationship between Mr. Mahoney and the attorneys of record for Guthrie only arose in the middle of the arbitration. Thus, it follows that Mr. Arnold was not required to disclose the relationship at the commencement of the arbitration as it was not yet evident. In July of 1987, during the pendency of the arbitration proceeding, Mr. Carmen Russo of Vincent, Berg, Russo, Marcigliano, &

---

**3.** We also note that it does not appear that there was a complete merger of firms, but rather a lateral move by only one partner. Thus, Globe's formulation of the facts to be applied to the *Morelite* standard is misleading.

48

Zawacki, the firm that was counsel of record for Guthrie, joined the firm of Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, from which Mr. Mahoney had retired as partner in June of 1985 and taken the title "of counsel." Counsel for Globe wrote to Mr. Mahoney inquiring about the propriety of his continued service on the panel in light of this new development. Globe's Petition to Vacate Award, Exhibit B. While Mr. Mahoney did not respond in what we would call an "expeditious" manner, he did eventually reply to the inquiry. *Id.* at Exhibit C. In that letter, Mr. Mahoney stated that after discussing the matter with his former partners, he had discerned that although Mr. Russo's old firm had been counsel of record, Mr. Marcigliano, not Mr. Russo, was and had always been the attorney handling the case, and that Mr. Russo did not take the file with him to Dougherty, Ryan et al. *Id.; see also* Affidavit of Vincent J. Barra, sworn to January 23, 1989, ¶ 11. Accordingly, he concluded that Dougherty, Ryan had no financial interest in the matter. Globe's Petition to Vacate Award, Exhibit C. Furthermore, he expressed his view that even if Dougherty, Ryan was to receive monetary benefit from the case, which it was not, he himself would not be enriched since pursuant to the terms of his retirement agreement he is to "receive a specific monthly payment for a period of years, based upon the firm's earnings *before* [his] retirement," *id.* (emphasis supplied), and does not participate in any fees earned by the firm subsequent to his retirement, *id.* This compensation package was disclosed at the commencement of the arbitration proceeding. *Id.* Consequently, Mr. Mahoney declined to recuse himself from the panel.

We believe that Mr. Mahoney's decision not to recuse was proper as his relationship with the firm of record for Guthrie approximates that found in *Andros Compania* in degree of intimacy. Mr. Mahoney has no "direct financial stake in the outcome of arbitration", *Andros Compania, supra,* at 701, and the shared relationship is far more attenuated than the normally cited familial relationship, *see Morelite, supra,* there-

fore, the claim of "evident partiality," as the standard is interpreted in the Second Circuit, fails.

Accordingly, in light of all of the foregoing, we decline to upset the arbitrators' award in favor of Guthrie and deny Globe's petition to vacate. Guthrie's cross petition to confirm the award is granted. Globe is directed to a submit a judgment on notice in accordance with this Order.

SO ORDERED.